[No. B181753. Second Dist., Div. Three. Dec. 28, 2006.]

GEORGE SARKA, Petitioner and Appellant, v.
THE REGENTS OF THE UNIVERSITY OF CALIFORNIA et al.,
Defendants and Respondents.

## COUNSEL

Hosey & Bahrambeygui, Sherry Bahrambeygui; and Karen G. Sarames for Petitioner and Appellant.

Catherine I. Hanson and Gregory M. Abrams for California Medical Association as Amicus Curiae on behalf of Petitioner and Appellant.

James E. Holst and Michael R. Goldstein for Defendants and Respondents.

## OPINION

## ALDRICH, J.—

### INTRODUCTION

Petitioner George Sarka, M.D., was employed as a primary care physician at the student health services' Arthur Ashe Student Health and Wellness Center (SHS) at the University of California at Los Angeles (the University). He filed a grievance challenging the University's decision to discharge him for repeatedly refusing to follow the directions of his superior to modify his approach to patient care to be more in accord with his SHS colleagues. The administrative hearing officer upheld the termination. Dr. Sarka appeals from the trial court's judgment that denied his petition for writ of administrative mandate (Code Civ. Proc., § 1094.5) seeking to overturn the hearing officer's decision.

At issue is whether the hearing officer and the trial court committed legal error by failing to apply Business and Professions Code section 2056, which declares it a violation of public policy for employers to penalize physicians "principally for advocating for medically appropriate health care." (§ 2056, subd. (c).) The record shows that both the hearing officer and the trial court considered and properly applied section 2056 and that substantial evidence supports the trial court's conclusion that Dr. Sarka was discharged for insubordination. Accordingly, we affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

*1. General background.*

Reviewing the administrative record, as we are required (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 810, 824 [85 Cal.Rptr.2d 696, 977 P.2d 693]),

it shows that for 14 years, Dr. Sarka was employed at SHS as a primary care physician. For most of his employment at SHS, Dr. Sarka reported directly to Dr. Jo Ann Dawson, director of primary care at SHS. Beginning in February 2001, he began reporting to assistant vice chancellor Edward Wiesmeier, M.D.

The mission of SHS is to "promote and enhance the health and wellbeing of UCLA students." SHS functions, in part, as a health maintenance organization for students. Registration fees prepay most of the services SHS provides. At SHS, students see primary care physicians who treat them directly, or when appropriate, refer them to other health care professionals for more specialized treatment. Dr. Sarka's job description included, among other things, "case management, the *judicious use of all resources*, and the '[. . .] competent provision of personal, medical care, including diagnosis and treatment . . . .' " (Italics added.)

In August 2002, the University notified Dr. Sarka that he was being dismissed from his position at SHS for refusing to modify his approach to patient care to make it more consistent with his colleagues in being less wasteful of resources by relying less on diagnostic testing and more on "optimal clinical judgment."

### 2. *Dr. Sarka's grievance.*

Dr. Sarka filed a grievance pursuant to the University's personnel policies for staff members (PPSM) alleging the University violated PPSM 65 and PPSM 70H. PPSM 65 provides for the termination of managers and senior professionals "when, in management's judgment, the needs or resources of a department or the performance or conduct of an employee do not justify the continuation of an employee's appointment." PPSM 70H forbids retaliating against employees for participating in the complaint resolution process. Dr. Sarka alleged that his termination was, in relevant part, "clearly retaliatory for advocating appropriate patient care . . . ."

Following step one of the PPSM grievance process, Dr. Sarka's case was reviewed by the interim vice chancellor. Discerning no violation of the PPSM, the vice chancellor found that the "dismissal was caused by Dr. Sarka's refusal to abide by the instructions given to him by his supervisor, Dr. Wiesmeier, regarding his tendency to, among other things, rely too heavily on 'diagnostic testing, repeated visits and referrals' and 'over-doctoring.' "

Dr. Sarka requested his grievance be moved to step two, an administrative factfinding hearing in front of a hearing officer, called an independent party reviewer (IPR).

3. *The evidence in the administrative record.*

a. *The University's case.*

At the hearing, the University took the position that Dr. Sarka's termination was reasonable and for good cause. Although Dr. Sarka was board-certified in neurology and rheumatology, he was clearly and repeatedly told he was hired and expected to function as a primary care physician. His caseload was no more complicated than were those of other primary care doctors at SHS. Dr. Sarka's "dismissal was not, as he claim[ed], an act of retaliation for . . . patient advocacy," but because of his wasteful use of resources by overreliance on diagnostic testing in lieu of relying on medical judgment.

The University's evidence showed that the patients at SHS are predominantly young, healthy, highly functional students "in an extremely selective and competitive academic setting." This patient population generally has infrequent, insignificant chronic problems. SHS's patients present with very common symptoms, which are due "[f]or the most part" to "self-limited issues." They suffer from colds, eating the wrong food, staying up late, or being under tremendous stress, all of which result in headaches, stomach aches, or other garden-variety problems.

The University issued two memoranda, in early 2000 and the spring of 2001, reminding the SHS staff that Dr. Sarka was a primary care physician and that *despite his expertise and training in specialty areas*, "*he is not to be a referral source for Neurology and Rheumatology patients by any SHS staff member*. Furthermore, clinical staff may not selectively book such patients for Dr. Sarka." (Italics added, original underscoring.) Dr. Wiesmeier's review of Dr. Sarka's charts showed that his patients generally had conditions that were no more complicated than those seen by his colleagues at SHS.

Despite Dr. Sarka's position as a primary care doctor, he treated every patient "as though his patient was a medical emergency, disaster or crisis . . . ." Dr. Sarka's patient notes indicated that he repeatedly ordered "very extensive[,] multiple tests with the outcome of normal results, some of which the patients had to pay for that really didn't add anything to the final

outcome . . . ." He ordered many tests—many of them to be run immediately—which tied up exam rooms, used up resources, threw other clinicians off their schedules, and overwhelmed the clinical support staff.

The University's evidence included references to articles in the Journal of the American Medical Association[1] and the handbook of the Accreditation Association for Ambulatory Health Care, Inc. (AAAHC);[2] references to generally accepted community standards of practice; along with data and charts showing the utilization of resources by all of the primary care physicians at SHS generally, and some comparisons to other University of California campuses.

Compared to test utilization levels of other primary care physicians at SHS, Dr. Wiesmeier found that Dr. Sarka's was much higher. As examples, for students with possible urinary tract infections, Dr. Sarka routinely ordered both labor-intensive urine microscopic evaluations and urine dipstick analysis. While his colleagues at SHS ordered both tests 44 percent of the time, Dr. Sarka did so 99 percent of the time. Dr. Sarka persisted in high rates of double testing despite a concerted organizational effort since 1998, as evidenced by numerous communications with clinical staff, to reduce urine microscopic testing by ordering it only when the physician felt it was needed, in accordance with other facilities. In another example, Dr. Sarka's pattern of testing for DHEA (dehydroepiandrosterone) and testosterone in female patients was "far in excess" of that of his colleagues at SHS and at other University of California campuses. Dr. Sarka was asked to reduce his reliance on this test by 80 percent to bring it more in line with his colleagues. Also, on average, Dr. Sarka saw his patients two visits per student, while his colleagues saw patients from the same pool 1.3 visits per student in the same five-month period. Finally, Dr. Sarka's use of X-rays "far exceed[ed]" that of his SHS colleagues and posed a particular problem because of the exposure of young, generally healthy students to radiation. Not only did Dr. Sarka's performance evaluations over time reflect the University's concerns about these practices, but both Dr. Dawson and Dr. Wiesmeier repeatedly spoke to Dr. Sarka directly about his overuse of resources, and requested he modify his management and care-delivery patterns.

---

[1] The article from the Journal of the American Medical Association addressed the dramatic increase in use and sensitivity of diagnostic testing and its unintended, negative consequences. (Fisher, M.D., et al., *Avoiding the Unintended Consequences of Growth in Medical Care, How Might More be Worse?* (Feb. 3, 1999) 281 JAMA 5.)

[2] According to the AAAHC handbook, to provide high-quality health care services, there should be, inter alia, an "absence of clinically unnecessary diagnostic or therapeutic procedures . . . [¶] . . . [¶] absence of duplicative diagnostic procedures . . . [¶] . . . [¶] the appropriateness of treatment frequency."

Dr. Wiesmeier concluded that Dr. Sarka's practice style was wasteful of resources and medically unjustified. In Dr. Wiesmeier's view, Dr. Sarka's failure to use adequate clinical judgment caused him to use too many clinically unnecessary diagnostic services and visits to manage his patients' ailments. Dr. Sarka's conduct not only violated the SHS mission to ensure the academic success of students, but it was not an efficient and effective use of resources. It absorbed students' time, had a negative impact on their academic success, and confused and alarmed students, who would come to believe they were sicker than they actually were. Dr. Wiesmeier stated, *"I am not in a position to comment on the appropriateness of [Dr. Sarka's] approach to medicine in other settings, but I can, and have, shared with [Dr. Sarka] that it is not appropriate in a student health center where many of the presenting issues revolve around young healthy adults with underlying stress and anxiety. This does not mean that there is no pathology in this cohort. Nonetheless, [Dr. Sarka's] approach unnecessarily exacerbates this for [Dr. Sarka's] patients because of [his] over-reliance on diagnostic testing, repeated visits and referrals."* (Italics added.)

b. *Dr. Sarka's case.*

Dr. Sarka claimed he was using his best clinical judgment and that he was discharged for advocating for his patients. He argued that specialty cases were referred to him because of his board certification in neurology and rheumatology, with the result that his patient mix was more complex than that of the other clinicians at SHS. He asserted that management used flawed data and data analysis in assessing his performance and placed cost containment above appropriate patient care.

As evidence, Dr. Sarka submitted, among other things, his correspondence with attachments. Therein, he asserted that, although he was hired as a generalist, and initially also because of his specialization, he later became exclusively a primary care doctor. Still, "there was a deluge of specialty referrals to [him] in Neurology and Rheumatology," and so it was "inappropriate to expect him to adhere to these same utilization profiles for testing and patient visits." Dr. Sarka claimed to have complied with every written directive. He felt, as a board-certified rheumatologist and neurologist, that he was "being efficient, effective, and appropriate in [his] medical care." (Italics omitted.) Dr. Sarka stated that he "appropriately order[s] tests to aid in the assessment and treatment of patients" when tests were "clinically indicated."

Dr. Sarka's witnesses testified that Dr. Sarka did not overtest or see patients too frequently and that he exercised good clinical judgment, was consistent and thorough, made appropriate diagnoses, and his workup was "relevant" to the complaint presented. One of Dr. Sarka's witnesses testified

"as an expert witness in medical management" and addressed efficiency in managed care. He did not testify about whether Dr. Sarka's conduct in opposition to Dr. Wiesmeier's directives was medically appropriate. One doctor testified that, while Dr. Sarka was asked to reduce his reliance on DHEA testosterone tests, the University of Southern California required its primary care physicians to conduct those tests rather than to refer such patients to specialists.[3]

c. *The dismissal.*

Finding Dr. Sarka to be steadfast in his unwillingness to accept Dr. Wiesmeier's directions, and that Dr. Sarka had no intention of modifying his practice as requested, the University sent Dr. Sarka its final notice of dismissal. Therein, Dr. Wiesmeier stated that Dr. Sarka "continue[d] to be unwilling to accept my directions to you, and that you see no reason and have no intention of modifying your practice as I have repeatedly requested of you." *Notwithstanding 15 months of warning, Dr. Sarka had not modified his workplace behavior or made progress in meeting Dr. Wiesmeier's requests and expectations.* To the degree Dr. Sarka complied with Dr. Wiesmeier's requests, it was "by [Dr. Sarka's] own admission, under protest and even then only minimally." In rebuttal to Dr. Sarka's charge that Dr. Wiesmeier was "placing cost containment above appropriate patient care," Dr. Wiesmeier cited a "recent study comparing UCLA's practice to that of other similar schools nationally [that had been] presented to and accepted by our Continuous Quality Improvement Committee." It showed that SHS "continues to have more pre-paid services available for its students than do the other 8 University of California Schools . . . . It indicates that the UCLA Ashe Center practice is far and away the most heavily reliant on laboratory testing. . . . It is in this setting that your practice and ordering patterns are by far the highest (in some cases more than double) of all your colleagues at the Ashe Center. *Recent reports reflect a decline in reliance on laboratory testing in our setting.* Your use continues to be excessive." (Italics added.) In short, Dr. Sarka's "*reluctance to modify aspects of [his] practice, that are so obviously out of line with everyone else's at the Ashe Center, and at benchmark universities, caused [Dr. Wiesmeier] great concern . . . .*" (Italics added.) Dr. Sarka was terminated from his employment as of August 23, 2002.

d. *The IPR's ruling.*

According to the IPR's 27-page report, the issue presented was "whether Dr. Sarka failed to comply with clear and reasonable expectations provided

---

[3] After oral argument, the parties provided this court with additional briefing that discussed the testimony in this case about the standard of care and whether Dr. Sarka breached it.

by his supervisor as to how he carried out his assigned duties at SHS." The IPR concluded, "[i]n the end, this case is about authority."

With respect to Business and Professions Code section 2056, the IPR observed that the first time Dr. Sarka raised the statute was in his closing brief. The IPR stated that Dr. Sarka's section 2056 "argument cannot prevail in this report because it is not properly before the hearing officer; it was not raised in a timely fashion as part of the formal Complaint (nor was it mentioned during the related hearings). Further, the [IPR] is constrained to decide on the Complaint at hand within the context of established University policy. Neither is he adequately versed in this area of statutory or case law. *However, it may be worth noting that, based on a plain reading of language of the statute referenced, the facts of the record would not support a contention that Dr. Sarka was terminated principally or primarily because he advocated appropriate health care.* Further, nothing in the record suggests that Dr. Sarka was more caring about the quality of health care received by the patients at SHS than was Dr. Wiesmeier or the many other health care professionals who work there. [¶] . . . [¶] *But that is not why he was terminated.* Rather, his termination resulted from a considered and extended lack of compliance related to Dr. Wiesmeier's requests that he modify his patterns of practice *in a way consistent with that of his physician colleagues at SHS and with the characteristics of the patient population.* Dr. Sarka was not asked to suspend his clinical judgment; indeed, he was encouraged to develop it and rely less on the mechanics of laboratory testing." (Italics added, original underscoring.) The IPR concluded, "[a]fter a thorough and thoughtful review of the record . . . [it] *does not support Complainant's allegation that his termination was in retaliation for . . . patient care advocacy.* . . . Based on the totality of evidence created in this record, it is the judgment of the Independent Party Reviewer that no violations of University personnel policy occurred related to Dr. Sarka's termination." (Italics added.) The IPR's findings and conclusions were affirmed by the executive vice chancellor and so Dr. Sarka's grievance was denied.

### 4. *Dr. Sarka's petition for administrative mandamus.*

Dr. Sarka commenced the underlying action by filing his petition for peremptory writ of administrative mandamus (Code Civ. Proc., § 1094.5) and for damages (Code Civ. Proc., § 1095). The petition alleged abuse of discretion and insufficient evidence to support the IPR's finding that Dr. Sarka was not discharged principally in retaliation for patient care advocacy.

The trial court denied Dr. Sarka's writ petition.[4] The court ruled that Dr. Sarka "was *not* fired for [incompetence, discipline, or] . . . *for advocating for medically appropriate healthcare for the students of UCLA [pursuant to] section 2056(a)* . . . . *Petitioner was fired for insubordination.*" (Italics added.) The court explained that one of the doctors is superior to the other, and that as subordinate employee, Dr. Sarka had the duty to obey orders given by his superior as long as those orders fell within the scope of his authority and *were not improper.* The record contained substantial evidence that the directives given to Dr. Sarka were proper under the circumstances. Dr. Sarka's timely appeal followed.

## DISCUSSION

### 1. *Standard of review.*

Pursuant to Code of Civil Procedure section 1094.5, when the trial court reviews an administrative decision that substantially affects a fundamental vested right, the trial court "not only examines the administrative record for errors of law but also exercises its independent judgment upon the evidence . . . ." (*Bixby v. Pierno* (1971) 4 Cal.3d 130, 143 [93 Cal.Rptr. 234, 481 P.2d 242]; see Code Civ. Proc., § 1094.5, subd. (c).)[5]

Under the independent-judgment standard, "the party challenging the administrative decision bears the burden of convincing the court that the administrative findings are contrary to the weight of the evidence." (*Fukuda v. City of Angels, supra,* 20 Cal.4th at p. 817.) "[The] trial court must accord a ' "strong presumption of . . . correctness" ' to administrative findings . . . ." (*Ibid.*) The trial court begins its review with the presumption that the administrative findings are correct, and then, after according the respect due these findings, the court exercises independent judgment in making its own findings. (*Id.* at p. 819.) Hence, when a court exercises its independent judgment, there is a "*limited* trial de novo." (*Bixby v. Pierno, supra,* 4 Cal.3d at p. 143, italics added, fn. omitted.)

---

[4] At the direction of the trial court, the parties notified this court that Dr. Sarka filed a second petition for peremptory writ of administrative mandamus in the same court as the first petition. Apparently, the trial court ordered the second petition abated pending the outcome of this appeal. Neither party has explained whether or how the second petition is relevant to the instant appeal.

[5] Subdivision (c) of section 1094.5 of the Code of Civil Procedure states, "Where it is claimed that the findings are not supported by the evidence, in cases in which the court is authorized by law to exercise its independent judgment on the evidence, abuse of discretion is established if the court determines that the findings are not supported by the weight of the evidence. In all other cases, abuse of discretion is established if the court determines that the findings are not supported by substantial evidence in the light of the whole record."

On appeal, we review a trial court's exercise of independent review of an agency determination for substantial evidence. (*Fukuda v. City of Angels, supra,* 20 Cal.4th at p. 824.) To the extent the trial court decided pure questions of law on undisputed facts, we review the judgment de novo. (*Anserv Ins. Services, Inc. v. Kelso* (2000) 83 Cal.App.4th 197, 204 [99 Cal.Rptr.2d 357].)

## 2. *Neither the IPR nor the trial court committed legal error in their application of Business and Professions Code section 2056.*

Dr. Sarka's sole challenge on appeal concerns Business and Professions Code section 2056. He states: "In this appeal, Dr. Sarka contends that the trial court judge (and the IPR) admittedly failed to properly consider—much less correctly apply—Business and Professions Code section 2056. Thus, the heart of this appeal involves legal error."

Manifestly, Dr. Sarka is wrong that both the trial court and the IPR "failed to properly *consider*" Business and Professions Code section 2056. Both reviewers addressed that statute. The IPR incorrectly stated initially that Dr. Sarka had not properly raised the statute; the grievance actually stated, "I believe that my termination is clearly retaliatory for advocating appropriate patient care. . . ." Notwithstanding that portion of its ruling, the IPR went on to *apply the statute to the facts presented.* The IPR stated: "[I]t may be worth noting that, based on a plain reading of language of the statute referenced, the facts of the record would *not support a contention that Dr. Sarka was terminated principally or primarily because he advocated appropriate health care.*" (Italics added, original underscoring.) Likewise, the trial court considered the statute. It ruled that Dr. Sarka "was *not* fired for advocating for medically appropriate healthcare [pursuant to] section 2056(a) . . . ." (Italics added.)

■ We conclude that both the IPR and the trial court properly *applied* Business and Professions Code section 2056 in this case. That statute was sponsored by the California Medical Association. It declares the policy of California "to encourage two types of advocacy for medically appropriate health care: (1) an appeal from a payor's decision to deny payment, and (2) a protest of a decision, policy, or practice that the physician reasonably believes impairs his or her ability to provide medically appropriate health care." (*Khajavi v. Feather River Anesthesia Medical Group* (2000) 84 Cal.App.4th 32, 47 [100 Cal.Rptr.2d 627].) Business and Professions Code section 2056 "was intended 'to provide an express statutory public policy in favor of physicians' advocacy for *appropriate* health care of their patients and against employment termination or penalization of physicians for such advocacy' and to 'state that a physician who has an employment or other contractual

relationship with a person should not be terminated or otherwise penalized *principally* for advocating for *appropriate health care* for his or her patient.' [Citations.]" (*Khajavi, supra*, at pp. 49–50, italics added, original italics omitted.)[6]

 The record contains substantial evidence to support the trial court's conclusion, after exercising its independent judgment, that the weight of the evidence before the IPR supported its finding that Dr. Sarka was not terminated "principally for advocating for medically appropriate health care" (Bus. & Prof. Code, § 2056, subd. (c)), but for refusing to modify his practice in response to SHS requests to perform as a primary care physician and to be less wasteful of health service resources and of student time. Specifically, the University submitted evidence supporting the testing and followup practices by which it expected Dr. Sarka to abide. Yet, Dr. Sarka did not comply with the University's repeated requests, over 15 months, to utilize resources more judiciously by relying more on his own clinical judgment. Rather, he resisted those requests. The University's witnesses testified about the deleterious effect on other physicians and staff at SHS and on patients because Dr. Sarka wasted resources, squandered students' time, and caused them needless concern about their health. The final notice of dismissal stated unequivocally that Dr. Sarka was discharged because he "continue[d] to be unwilling to accept my directions to you, and that you see no reason and have no intention

---

[6] The relevant portions of Business and Professions Code section 2056 read:

"(b) It is the public policy of the State of California that a physician and surgeon be encouraged *to advocate for medically appropriate health care* for his or her patients. For purposes of this section, *'to advocate for medically appropriate health care'* means . . . to protest a decision, policy, or practice that the physician, consistent with that degree of learning and skill ordinarily possessed by reputable physicians practicing according to the applicable legal standard of care, reasonably believes impairs the physician's ability to provide medically appropriate health care to his or her patients.

"(c) The application and rendering by any person of a decision to terminate an employment or other contractual relationship with, or otherwise penalize, a physician and surgeon *principally* for advocating for medically appropriate health care consistent with that degree of learning and skill ordinarily possessed by reputable physicians practicing according to the applicable legal standard of care violates the public policy of this state. No person shall terminate, retaliate against, or otherwise penalize a physician and surgeon for that advocacy . . . .

"(d) This section shall not be construed . . . to prohibit a medical group, independent practice association, preferred provider organization, foundation, hospital medical staff, hospital governing body acting pursuant to Section 809.05, . . . from enforcing reasonable peer review or utilization review protocols or determining whether a physician has complied with those protocols. [¶] . . . [¶]

"(f) Nothing in this section shall be construed to prohibit the governing body of a hospital from taking disciplinary actions against a physician and surgeon as authorized by Sections 809.05, 809.4, and 809.5." (Italics added.)

of modifying your practice as I have repeatedly requested of you." Therefore, the evidence supports the trial court's conclusion Dr. Sarka *was discharged for insubordination.*

■ Dr. Sarka quotes from the court that it had "neither the expertise nor the duty to decide which of the two physicians [Dr. Sarka or Dr. Wiesmeier] is right." He argues this quotation demonstrates that the court improperly *refused* to apply Business and Professions Code section 2056. We disagree. Looking at the statute, its application requires expert testimony about whether a physician's advocacy was "medically appropriate." (See *Khajavi v. Feather River Anesthesia Medical Group, supra*, 84 Cal.App.4th at p. 42 [the physician-employee introduced expert testimony that his advocacy was "medically appropriate" and why].) Trial courts are not trained in medicine and are not equipped to make judgments between different physicians' approach to the practice of medicine; nor should courts be expected to make those determinations in a vacuum. That is the very reason expert opinion testimony is required. (*Landeros v. Flood* (1976) 17 Cal.3d 399, 410 [131 Cal.Rptr. 69, 551 P.2d 389]; cf. *Flowers v. Torrance Memorial Hospital Medical Center* (1994) 8 Cal.4th 992, 1001 [35 Cal.Rptr.2d 685, 884 P.2d 142] [the standard of care is peculiarly within the knowledge of experts and can only be proved by expert testimony]; *Alef v. Alta Bates Hospital* (1992) 5 Cal.App.4th 208, 215 [6 Cal.Rptr.2d 900]; *Keen v. Prisinzano* (1972) 23 Cal.App.3d 275, 279 [100 Cal.Rptr. 82].)

Expert testimony was provided in the context of Business and Professions Code section 2056 in *Khajavi v. Feather River Anesthesia Medical Group, supra*, 84 Cal.App.4th 32. There, Khajavi, an anesthesiologist, disagreed with a surgeon about the medical wisdom of subjecting a particular patient to cataract surgery and quit the surgery just before it commenced. After the employer medical group declined to renew Khajavi's contract, he sued alleging he was discharged from employment in violation of Business and Professions Code section 2056. The medical group moved for nonsuit arguing Khajavi had failed to establish that he had been terminated in retaliation for his disagreement with the surgeon. (*Khajavi, supra*, at pp. 44–45.) The appellate court reversed the nonsuit judgment holding that section 2056 protects physicians and surgeons from being penalized for advocating for medically appropriate health care. There, Khajavi *"introduced expert testimony that his withdrawal from the cataract surgery was medically appropriate . . ."* and the reason why. (*Khajavi, supra*, at p. 42, italics added.)

Here, the trial court correctly applied Business and Professions Code section 2056. The University substantiated its position with medical literature and references to generally accepted standards of practice in the community of primary health care physicians at SHS, at student health centers at the other

University of California campuses, and at "benchmark universities." No one at SHS had been sued for malpractice. Thus, the University's evidence established that the University's policies were medically appropriate for student health care at large university campuses and the reason Dr. Sarka's failure to abide by the practice requirements was harmful to SHS and students.

By contrast, Dr. Sarka presented evidence that his performance did not fall below the standard of care. *But this case is not about negligence or malpractice.*[7] What was relevant to Business and Professions Code section 2056 in this case was whether, in refusing to rely more on his own medical and clinical judgment and less on diagnostic testing, Dr. Sarka was "advocating for medically appropriate health care." (§ 2056, subd. (c).) Toward that end, Dr. Sarka was obligated to demonstrate that his advocacy was "medically appropriate" for primary care physicians in a large university's student health service. This he did not do. Nor did he undermine the medical appropriateness of the University's directives to him.[8] Generally, in mandamus proceedings where the independent judgment standard of review applies, the trial court is limited to *consideration of the evidence presented to the administrative board.* (*Bixby v. Pierno, supra,* 4 Cal.3d at p. 143, fn. 10 [trial court reviews evidence before administrative agency, or which could have been adduced at administrative hearing, or which was improperly excluded from that hearing]; Super. Ct. L.A. County, Local Rules, rule 9.5(g).) Thus, insofar as the evidence here did not include relevant expert testimony on whether Dr. Sarka's advocacy was "medically appropriate" (§ 2056, subds. (b) & (c)), the trial court clearly did not have the *expert* evidence to make a decision under this statute. Given the omission of the necessary testimony here, Dr. Sarka failed to present the trial court with evidence that it could weigh against that of the University. Thus, the evidence supports the trial

---

[7] Although one of Dr. Sarka's witnesses testified about the University of Southern California's practice with respect to the DHEA testosterone test, that testimony does not undermine the medical appropriateness of the University's general practice, particularly given the University also considered the patterns of other University of California campuses.

[8] Dr. Sarka's argument that "cost became *more important* and patient welfare correspondingly declined in importance" (italics added) at SHS is not supported by the record. The evidence shows, among other things, that the tests Dr. Sarka overordered were paid for directly by the students and had little impact on the University's bottom line. Moreover, Dr. Wiesmeier demonstrated his sincere concern about the students' well-being. He repeatedly pointed out to Dr. Sarka the deleterious effect the latter's practice was having on students and their welfare caused by unnecessary anxiety about being ill and extra time they were spending in the SHS offices for repeat visits. That was one of the reasons cited for Dr. Sarka's termination from employment. In any event, the University's notice of dismissal to Dr. Sarka set forth its rebuttal to Dr. Sarka's charge by citing a recent study comparing the University's practice to that of other similar schools nationally, which study was accepted by the University's continuous quality improvement committee.

court's conclusion that Dr. Sarka was not discharged principally for advocating medically appropriate health care.

Amicus curiae insists that to properly rebut the University's aggregated statistical data, Dr. Sarka had to rely on patient charts and his expert should have been able to review information that directly shows facts upon which the doctor relied in making his medical decision for each patient. Yet, Dr. Sarka's witnesses testified after looking at specific patient charts, that Dr. Sarka met the standard of care in that he was thorough and did not misdiagnose. What was relevant was whether Dr. Sarka's refusal to rely more on his medical judgment and less on testing was *medically appropriate*. Even assuming his practice was medically appropriate, however, because Dr. Sarka did not demonstrate that the University's requirements were not medically appropriate, the IPR and the trial court were left only with the conclusion that Dr. Sarka's refusal to comply with the University's request constituted insubordination.[9]

Dr. Sarka justifies his practice pattern by arguing that he saw a special mix of patients compared with that of his colleagues because of his certification in neurology and rheumatology. His witnesses testified to this and discussed the patients they referred to him in his capacity as a specialist. However, not only did the University repeatedly tell Dr. Sarka and his colleagues that Dr. Sarka was a primary care physician and was not to receive referrals, but the record shows that Dr. Wiesmeier reviewed Dr. Sarka's charts and discovered that his patient mix was not special, but resembled that of the other primary care doctors at SHS. Therefore, the trial court had a basis for rejecting Dr. Sarka's rationale for his conduct. While Dr. Sarka contends that he was advocating for appropriate health care for his special patients pursuant to Business and Professions Code section 2056, the University's evidence provided a basis for the trial court to conclude that Dr. Sarka was not advocating "medically appropriate" health care for a large university's student health service.

To summarize, the record is replete with documentation and testimony supporting the University's position. Dr. Sarka's claim he was practicing the best medicine he could does not transform his termination into a violation of Business and Professions Code section 2056. Even if his discharge penalized him for advocating appropriate medical care—a position that was not supported by expert testimony—he was not fired *"principally"* for that reason. (§ 2056, subd. (c), italics added.) Therefore, neither the IPR nor the trial court abused its discretion or committed error. (Code Civ. Proc., § 1094.5, subd. (c); *Fukuda v. City of Angels, supra*, 20 Cal.4th at p. 824.)

---

[9] We reject the argument of amicus curiae that the PPSM prohibits raising this statute in a grievance. We see no reason why doctors should not be able to raise this statute and adduce the necessary evidence at an administrative hearing.

## DISPOSITION

The judgment is affirmed.

Croskey, Acting P. J., and Kitching, J., concurred.

Appellant's petition for review by the Supreme Court was denied March 21, 2007, S150081.