Filed 5/13/13  Certified for publication 6/11/13 (order attached)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| JAMES DO,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,<br><br>    Defendant and Respondent. | D061056<br><br><br>(Super. Ct. No. 37-2011-00083720-CU-WM-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Ronald L. Styn, Judge.  Affirmed.

Law Office of Jose A. Gonzales and Jose A. Gonzales for Plaintiff and Appellant.

Paul, Plevin, Sullivan & Connaughton, Sandra L. McDonough and Corrie J. Klekowski for Defendant and Respondent.

Plaintiff and appellant James Do appeals the judgment denying his petition for a writ of administrative mandamus against defendant and respondent Regents of the

University of California (University).  (Code Civ. Proc.,[1] § 1094.5.)  Do's employment at a University medical facility was terminated in August 2009, based on administrative findings his statements and acts violated an employment policy against workplace violence or threats.

On appeal, Do contends the trial court incorrectly failed to apply the independent judgment standard of review, because he was a permanent employee deprived of a property right in employment and arguably, only legal questions are presented for review. (*Sarka v. Regents of University of California* (2006) 146 Cal.App.4th 261, 271 (*Sarka*).) Do next contends that even if the substantial evidence test is applied, insufficient evidence supports the administrative decision that he posed any credible threat to his supervisor.

In response, the University argues the trial court correctly applied the authority of *Ishimatsu v. Regents of University of California* (1968) 266 Cal.App.2d 854 (*Ishimatsu*), which held that under the California Constitution, article IX, section 9, the University as a constitutionally created state institution has been delegated the quasi-judicial power to conduct its own administrative decisionmaking on staff employment matters.  (*Ishimatsu, supra,* at pp. 864-865.)  That interpretive approach is based on the terms of California Constitution, article IX, section 9, subdivision (a), characterizing the University as a " 'public trust . . . with full powers of organization and government.' "  (*Campbell v. Regents of University of California* (2005) 35 Cal.4th 311, 320 (*Campbell*), relying on

_____

[1]     All further statutory references are to the Code of Civil Procedure unless noted.

*Ishimatsu*.)  California Constitution, article IX, section 9, subdivision (f) likewise delegates a broad range of powers and duties to the University ("all the powers necessary or convenient for the effective administration of its trust").

The views expressed in *Ishimatsu, supra,* 266 Cal.App.2d 854, 864-865 have also been discussed with evident acceptance and approval by the California Supreme Court in *Miklosy v. Regents of University of California* (2008) 44 Cal.4th 876, 889-890 (*Miklosy*). Because substantial evidence has long been designated the appropriate standard of review for an administrative decision made by such an agency, the University argues for application of that standard and contends the record substantially supports the dismissal decision, giving the trial court no basis to set it aside.

Unlike *Sarka, supra,* 146 Cal.App.4th 261, this is not a case in which predominantly legal questions are presented on a given set of facts.  Nor is it a case that would require us to re-analyze the authority characterizing the University as an agency that is constitutionally delegated quasi-judicial administrative decisionmaking authority, even in such employment matters.  Instead, the trial court appropriately applied the substantial evidence review standard to this set of administrative appeals that involved conflicting viewpoints and that was appropriately resolved at the administrative level, under the generally accepted line of constitutional authorities.  (*Ishimatsu, supra,* 266 Cal.App.2d at pp. 864-865.)  On this record, the trial court appropriately determined there was no basis for setting aside the University's decision that there was substantial cause to terminate Do's employment.  We affirm.

3

FACTUAL AND PROCEDURAL BACKGROUND

A. Events of Employment; Warning Letter and Meeting

In January 2008, the University hired Do, an experienced intellectual technology professional (IT), as a Programmer/Analyst II. He was assigned to the University's radiation oncology department located at the Moores Cancer Center in La Jolla, California (the medical center).

Under University employment policies provided to employees, online and in handbook form, there is zero tolerance for "intimidation" or "threats of violence" toward colleagues. (Medical Center Policy (MCP) 538.2K; "the Policy"). Intimidation is defined by the Policy as "an intentional act towards another person, the results of which causes the other person to reasonably fear for his/her safety . . . ." The Policy defines a "threat of violence" as "an intentional act that threatens bodily harm to another person . . . ." Violation of these standards subjects the employee to discipline up to and including dismissal, under University personnel policies.

In February 2008, Do began working with Richard Fletcher, his supervisor, as a two-person team for providing computer assistance and maintenance services at the medical center. Fletcher's supervisor was the director of physics at the medical center, Todd Pawlicki. Fletcher supervised Do as they collaborated on installing, configuring and maintaining the computer workstations, servers and software for other personnel. As Do's supervisor, Fletcher gave Do a performance review stating he met (not exceeded) evaluation standards as of October 29, 2008. The medical center professes a set of "Core

4

Values" regarding teamwork and honesty, and Do's performance was initially rated satisfactory in those respects.

During April through July 2009, Do communicated by e-mail with a superior, associate administrator for oncology services Trisha Lollo, to question certain IT purchasing decisions involving Fletcher and others that he considered to be unlawful or wasteful. On May 28, 2009, Fletcher asked Do to help other IT personnel install new computers in a new building, but Do told him that was not his job and refused.

While Fletcher was on vacation, Do had problems at work in accessing computer records for patients needing radiation treatment, since Fletcher's personal password was required but unavailable to him.

When Fletcher returned from vacation, he asked Do on June 4, 2009 to install a fax machine, but Do said he was too busy, or made a similar comment. In any case, Do walked away to his workstation and sat down. Fletcher followed Do, and while standing somewhat behind and to the right of Do, Fletcher asked Do what else he had going on. According to Do, Fletcher said, "I want you to set up the fax machines right now" and Do replied, "Can this wait?" Next, Do turned his head and said to Fletcher "Get out of my face." Other nearby employees overheard, and Fletcher thought that the situation was pretty intense, felt disturbed, and left the area.

Over the next month, Fletcher talked to Pawlicki many times about his problems with Do, who sometimes disregarded his work-related requests. Pawlicki understood from Fletcher that Do was demonstrating a pattern of behavior or neglect of the position that led up to other issues, such that Fletcher believed he would not have a positive

5

experience in approaching Do about office work.  Pawlicki believed that the June 4 event seemed to take it to a different level and increased the existing stress and strain between Fletcher and Do.

A few days after the June 4 incident, Fletcher, Pawlicki and a lateral level supervisor, oncology department clinical operations manager Laura Adams, decided to issue a written warning to Do and referred the matter to the human resources department for preparation.  Fletcher went on vacation again.  Do had not previously been issued any warning notices or letters of reprimand.

In early July, Fletcher returned to the office, and within a few days, he met with Do to discuss Do's recommendation that all key patient records retrieval personnel should be given a password.  Fletcher agreed to change the records retrieval practice to accord with Do's recommendation.

In July 2009, Do complained about the ongoing records retrieval issue to his manager Adams, telling her that Pawlicki was not very concerned about it, but the problems could become dangerous to patients.  Do also told her that he thought Fletcher was trying to push him out the door by sending him a job announcement from another employer.

On July 8, 2009, Adams and Fletcher met with Do.  They discussed the records retrieval issue, and then Fletcher delivered a "Letter of Warning" to Do.  The letter referred to Do's May 28 "not my job" comment and another matter, and then stated:  "On June 4, 2009 you refused to help with my request to set up the new fax machines for the new building.  When I asked you what else you had going on you replied 'Get out of my

6

Face.' " Fletcher then asked Do why he said that. Do explained that he had said that so that he (Do) "wouldn't 'deck' " him (Fletcher).

According to later testimony from Fletcher and Pawlicki, the July 8 meeting ended soon thereafter, with Fletcher feeling a little "stunned," intimidated and afraid of physical harm from Do. According to Do, he intended to explain that at the time, he had been trying not to escalate the argument and thus he wanted Fletcher to leave him alone or back off. Do felt "shocked" to get a written warning, but not angry. He remembered he was slumping in his chair during the meeting.

Fletcher and Adams reported Do's explanatory comments at the July 8 meeting to Pawlicki and to University human resources personnel (including labor specialist Thomas Becker). A few days after the July 8 meeting, Adams sent an e-mail to Becker, Fletcher and Pawlicki, stating that she had observed the July 8 meeting and heard Do explain to Fletcher that on June 4, he had told Fletcher to get out of his face, because "I didn't want to deck you," and that he had repeated it again later in the conversation, stating "it is better than getting violent."

On July 10, Pawlicki notified Do he was being placed on paid investigatory leave because he had threatened violence against his supervisor during a disciplinary meeting. By memo dated July 16, 2009, Adams sent Do a notice of intent to terminate his employment July 31, based on his response at the July 8 meeting to the question about why he told his supervisor to get out of his face ("by indicating so that you wouldn't 'deck him' "). Adams stated that the above incident demonstrated unsatisfactory performance and inappropriate conduct that was inconsistent with University policy and core values.

7

Do was notified of his right to respond. He received a "Skelly" hearing August 6, 2009, and the decision to terminate was not overturned.[2] The University made a final payment to him with a termination date of August 7, 2009.

## B. Administrative Appeals

Do appealed his dismissal through three levels of University administrative review, but each adhered to the termination decision. Do originally raised issues regarding his arguable whistleblower activities (complaining about excessive spending), but he has not pursued them, instead focusing on the threat/intimidation reason given for termination, as arguably insufficient.

Trisha Lollo, associate administrator for oncology services, denied Do's Step 1 appeal, stating that her review showed that his termination for unsatisfactory performance and inappropriate conduct was justified, due to violation of the University's zero-tolerance standard and core values regarding threats, intimidation or violence in the workplace.

In a letter dated April 19, 2010, Do's Step 2 appeal was denied by Paul Craig (Chief Human Resources, Safety and Risk Officer for the medical center), as follows: "On July 8, 2009 during a disciplinary meeting . . . you stated to your supervisor [Fletcher] in the presence of your manager [Adams] that the reason for the inappropriate communication of June 4, 2009 was, 'So I wouldn't deck him.' [This] was a verbally

---

2    *Skelly v. State Personnel Board* (1975) 15 Cal.3d 194, 215 ["preremoval safeguards must include notice of the proposed action, the reasons therefor, a copy of the charges and materials upon which the action is based, and the right to respond, either orally or in writing, to the authority initially imposing discipline"].

8

communicated threat of violence in direct violation of MCP 538.2K and UCSD Medical Center's Core Values."

Third, an evidentiary hearing before a non-university hearing officer was held on November 17, 2010. Do, Fletcher and Pawlicki testified and a tape-recorded transcript is in the record. Do agreed that saying "get out of my face" had been inappropriate and explained that he often associated with younger people who talk that way. He did not remember using the term "deck you," and did not think he would have used it. Do explained that in light of his 18 years of experience in IT matters, he did not really need instructions from Fletcher on how to accomplish a certain task. Do did not want to return to the same IT department, in light of all that had happened, although he could do so and improve his communication if necessary.

On December 20, 2010, the hearing officer issued his decision upholding the termination of Do's employment. The hearing officer acknowledged that Do may have been overqualified for his job as number two on the team, which could have led to his frustrations there. The hearing officer ruled that on July 8, 2009, Do had committed an act that violated Policy 538.2K: "The act in question is the statement [Do] made to Fletcher in response to the inquiry about what he meant by his June 4 remark." This was determined to amount to an "intentional act" within the meaning of the policy, since it was made voluntarily and because Do intended to say what he said: "The response was not involuntary; it was volunteered, and thus meets the Webster definition of an 'act.' It also is intentional; what he [Do] said was intended to be said." Do's statement was an act that "create[d] a fear of harm," and he had intentionally "caus[ed] Fletcher to be fearful

9

that [Do] might respond to his attempts to supervise him by a physical attack on Fletcher." The University adopted the hearing officer's recommendation of termination.

C.  Administrative Mandamus Petition and Ruling

On January 13, 2011, Do filed a petition for writ of administrative mandamus seeking reinstatement and lost compensation. He lodged the administrative record and contended that the trial court should apply its independent judgment in reviewing the decision. Do argued that the hearing officer's findings of intentional threats were not supported by the weight of the evidence and Fletcher could not have developed a reasonable fear of harm. Do claimed that he was dismissed based only on speculation, and that his later expressed thoughts and explanation about why he said what he said on June 4 did not provide an adequate basis for termination

In opposition, the University contended that a substantial evidence standard of review applied, because it is a constitutional agency authorized to conduct quasi-judicial review of employment-related decisionmaking. (Cal. Const., art. IX, § 9.) Once that standard was applied, the termination decision was proper for Do's demonstrated insubordination, even if his comments on July 8 were not technically threats or did not amount to intimidation at a criminal level. They were nevertheless implied threats that were willfully made and therefore dismissal was justified for violation of University policies.

A court hearing on the petition was held on September 23, 2011. Do argued there was no evidence that he intended to carry out any threat, or that he intended to cause Fletcher to fear for his safety, but instead, he had been obligated to answer questions put

10

to him at the disciplinary hearing.  In reply, the University said no one had forced Do to explain himself in that manner, but when he did so, the employer was entitled to determine that his acts were in violation of University policy.  (See *City of Palo Alto v. Service Employees Internat. Union* (1999) 77 Cal.App.4th 327 [an employee's threat at the workplace did not necessarily require the employee to be fired; interpreting prior version of section 527.8].)

At the close of the argument, the trial court indicated Do's petition would be denied, while expressing this reservation:  "I'm not sure I would come to the same result if I were the hearing officer or if it was an independent standard of review, but using the substantial evidence test in the context of the language, I think I'm compelled to make the finding that I do in my tentative.  I think it's a very close case. . . . [¶] . . . [¶] . . . I'll be very candid. When I first looked at it, I said wow, how could they fire a guy for this. That was my first reaction.  But then when I got more into it, I think that under the law, they had the right to do what they did, but I think it's very, very close."  A ruling was issued denying the petition, and Do appeals the judgment.

DISCUSSION

I

*STANDARD OF REVIEW AND ISSUES PRESENTED*

Section 1094.5 sets forth the procedure for judicial review of an order or a decision by an administrative agency.  (*Bixby v. Pierno* (1971) 4 Cal.3d 130, 137 (*Bixby*).)  Under section 1094.5, subdivision (b), an agency's abuse of discretion may be established if its decision is not supported by the findings, or the findings are not

11

supported by the evidence. The next step of the procedure, determining the applicable standard of review as specified in section 1094.5, subdivision (c), depends on the type of administrative agency decision that is involved, due to principles protecting the separation of powers. (*Bixby, supra*, at p. 141.)

It is well recognized that certain types of administrative agencies are "of constitutional origin" and "have been granted limited judicial power by the Constitution itself." (*Strumsky v. San Diego County Employees Retirement Assn*. (1974) 11 Cal.3d 28, 35 (*Strumsky*); *Boren v. State Personnel Board* (1951) 37 Cal.2d 634; *Covert v. State Board of Equalization* (1946) 29 Cal.2d 125; *Palm Springs Turf Club v. California Horse Racing Board* (1957) 155 Cal.App.2d 242.) As explained by a commentator: "A relatively few state agencies derive their quasi-judicial or adjudicating powers from the Constitution itself. Their findings are not subject to reexamination in a trial de novo [citation], but will be upheld if supported by substantial evidence." (8 Witkin, Cal. Procedure (5th ed. 2008) Extraordinary Writs, § 260, p. 1168.) Such constitutionally authorized quasi-judicial agency decisions are subject under section 1094.5, subdivision (c), to substantial evidence review, in which "abuse of discretion is established if the court determines that the findings are not supported by substantial evidence in the light of the whole record." (8 Witkin, Cal. Procedure, *supra,* at p. 1168.)

Do argues that such a constitutional delegation of quasi-judicial power must be express and specific, as opposed to the more general delegation of quasi-judicial administrative decisionmaking power that was analyzed in *Ishimatsu, supra*, 266 Cal.App.2d 854, 864-865, regarding the language of the California Constitution, article

12

IX, section 9. Absent very specific language of express delegation, Do contends that the alternative provisions of section 1094.5, subdivision (c) may be applied to his case, to allow or require the trial court to exercise its independent judgment on the evidence, and to determine the agency has abused its discretion "if the court determines that the findings are not supported by the weight of the evidence." He justifies this request by pointing to the nature of his property interest in his previous, permanent employment.

This was a close case, as the trial court candidly acknowledged, and thus the standard of review utilized on appeal is critical for evaluating the validity of Do's claimed property right to continued employment, as opposed to the University's right to administratively interpret and apply its employment policies. However, as next explained, Do can point to no authority requiring the University to assert a more explicit constitutional delegation of quasi-judicial administrative decisionmaking power, even in an employment rights case.

II

*EXTENT OF ADMINISTRATIVE AGENCY AUTHORITY*

A. Development of Case Law

Do's petition and appeal allege that the hearing officer committed a prejudicial abuse of discretion, his decision was not supported by the findings, and the findings were not supported by the evidence. (§ 1094.5, subd. (b).) Do argues the explanatory statements he made on July 8 did not amount to intimidation or threats that were made at that time toward anyone in particular, within the meaning of the University policies and

13

employee handbook, and if the trial court were allowed to utilize independent judgment, it would have agreed with him.

Do fails to recognize that not every circumstance of public employment creates vested property rights to continue it.  Instead, statutory or due process entitlement to independent judgment review in a particular case depends upon the type of public agency involved and whether the agency was created by the Constitution in such a manner as to delegate quasi-judicial decisionmaking powers.  This was made clear in *Strumsky, supra*, 11 Cal.3d 28, 34-35:  A right to "a full and independent judicial review" of an agency's decision to terminate an individual's public employment *does not exist* in the case of agencies "of constitutional origin which have been granted limited judicial power by the Constitution itself."  (*Ibid.*, italics omitted, citing *Ishimatsu, supra*, 266 Cal.App.2d 854, among others.)  Thus:

> "It is established that when a review of a decision of an agency falling within [such] categories is sought pursuant to section 1094.5 of the Code of Civil Procedure, the court's scrutiny of the agency's factual findings is limited to a determination whether those findings are supported by substantial evidence in light of the whole record -- *and this is so whether or not the decision of the agency affects a fundamental vested right*."  (*Strumsky*, *supra*, 11 Cal.3d 28, 35; italics added.)

*Ishimatsu*, *supra*, 266 Cal.App.2d 854, 864, and *Amluxen v. Regents of University of California* (1975) 53 Cal.App.3d 27, 32, are generally accepted authorities stating that the California Constitution has granted the University quasi-judicial powers regarding matters falling within its broad powers to organize and govern the university, and this includes quasi-judicial adjudication of employment rights.  (Cal. Const., art. IX, § 9,

14

subd. (a); *Apte v. Regents of University of California* (1988) 198 Cal.App.3d 1084, 1091 (*Apte*).) Such University administrative decisions are subject to review under the substantial evidence rule. (8 Witkin, Cal. Procedure, *supra*, Extraordinary Writs, § 290, pp. 1208-1209.)

Similar to the state personnel board in *Skelly*, *supra*, 15 Cal.3d 194, the University is " 'a statewide administrative agency which derives [its] adjudicating power from [article IX, section 9, of] the Constitution . . . [; therefore, its factual determinations] are not subject to re-examination in a trial de novo but are to be upheld by a reviewing court if they are supported by substantial evidence. [Citations.]' " (*Skelly*, *supra*, at p. 217, fn. 31.) The California Constitution, article IX, section 9, subdivisions (a) and (f) together enumerate the University's powers and duties regarding management and disposition of its property, and also specify it shall have "all the powers necessary or convenient for the effective administration of its trust" (Cal. Const., art. IX, § 9, subd. (f)), such as engaging in litigation and delegating to its committees and faculty "such authority or functions as it may deem wise." (*Ibid.*)

More recently, in *Miklosy, supra*, 44 Cal.4th 876, 889, our Supreme Court confirmed, or took as established, this "unique constitutional status of the University of California," in the course of applying certain procedural provisions of the California Whistleblower Protection Act (Gov. Code, § 8547 et seq.). In *Miklosy*, the court relied on *Campbell*, *supra*, 35 Cal.4th at pages 320 to 321, for this same concept: " 'The California Constitution establishes the [University] as a "public trust . . . with full powers of organization and government." (Cal. Const., art. IX, § 9, subd. (a).) We have observed

15

that 'Article IX, section 9, grants the [R]egents broad powers to organize and govern the university and limits the Legislature's power to regulate either the university or the [R]egents. . . .' This grant of constitutional power to the University includes the grant of quasi-judicial powers, *a view that is generally accepted in our jurisprudence*." (*Miklosy, supra,* at p. 889; italics added; citing *Ishimatsu*, *supra*, 266 Cal.App.2d 854, 864; *Apte*, *supra*, 198 Cal.App.3d 1084, 1091.)[3] "In short, the University functions in some ways like an independent sovereign, retaining a degree of control over the terms and scope of its own liability." (*Miklosy, supra,* at p. 890.) " 'It is apparent that the Regents as a constitutionally created arm of the state have virtual autonomy in self-governance.' " (*Campbell, supra,* 35 Cal.4th at pp. 320-321.)[4] Staff discipline matters fall within these powers.

Moreover, there is no reason to believe that these statements in *Campbell, supra,* 35 Cal.4th at pages 320 through 321, or *Miklosy, supra*, 44 Cal.4th at page 889 are confined to the factual context of interpreting whistleblowing statutes, simply because the analyses were delivered in such cases. Nothing new has been presented to require us to

_____

[3] In *Apte,* the court noted that the decision in *Ishimatsu, supra*, 266 Cal.App.2d 854, 864, has found "general acceptance" regarding the constitutional grant of power to the University as including the grant of quasi-judicial powers. (*Apte, supra,* 198 Cal.App.3d at pp. 1090-1091, citing *Smith v. Regents of University of California* (1976) 58 Cal.App.3d 397, 400; *Amluxen v. Regents of University of California, supra*, 53 Cal.App.3d 27, 33.)

[4] As early as 1975, an appellate court in *Arroyo v. Regents of University of California* (1975) 48 Cal.App.3d 793, 798, noted that *Ishimatsu, supra*, 266 Cal.App.2d 854, has been referred to "without disapproval" in *Regents of University of California v. Superior Court* (1970) 3 Cal.3d 529, 534.)

16

find lacking the basic constitutional language of article IX, section 9, that delegates quasi-judicial administrative decisionmaking powers to the University.  (See *Amluxen v. Regents of University of California, supra*, 53 Cal.App.3d 27, 32-33 [discussing delegation language issue].)

In *Goldbaum v. Regents of University of California* (2011) 191 Cal.App.4th 703, 709, this court acknowledged the authority that the University is a " 'statewide administrative agency' " and as " ' "a constitutionally created arm of the state [it has] virtual autonomy in self-governance." ' "  (*Ibid.*)  The few exceptions to this rule of " 'general immunity from legislative regulation' " are not implicated in Do's case:  the Legislature's powers of (a) appropriation for salaries; (b) enaction of general police power regulations to be applied to the University; and (c) legislation that regulates "matters of statewide concern not involving internal university affairs."  (*Ibid.*)

Thus, it is well settled that the delegated powers that are necessary or convenient for the effective administration of the University's business include quasi-judicial administrative authority to resolve individualized employment disputes, by applying University policies to particular cases.  (*Ishimatsu, supra*, 266 Cal.App.2d 854, 861.)  The underlying rationale is that the University and its Board of Regents are public legal entities " 'charged with the government of a public trust.' "  (*Regents of University of California v. Superior Court, supra*, 3 Cal.3d 529, 539, fn. 12.)

Such "governance" of University activities requires due process in the carrying out of its personnel functions, such as adopting and administering employment policies.  In *Miklosy*, *supra*, 44 Cal.4th 876, 890, footnote 4, it is clarified that in general, the

17

University's consideration of an employment-related complaint "cannot be so perfunctory or arbitrary as to violate the due process guarantee of the state or federal Constitutions." Earlier, in *Ishimatsu, supra*, 266 Cal.App.2d 854, 861, the court noted " '. . . the power [to dismiss public employees] may not be exercised arbitrarily in disregard of the employee's constitutional rights.' " (Citing *Bagley v. Washington Township Hospital Dist*. (1966) 65 Cal.2d 499, 503-504; *Ball v. City Council of City of Coachella* (1967) 252 Cal.App.2d 136, 141.)[5]

Such constitutional grants of quasi-judicial adjudicative power do not offend due process standards. "Although administrative agencies are not courts in any manner, administrative agencies exercising adjudicatory powers are judicial bodies in effect or in a broad sense have and exercise 'adjudicatory' or 'determinative' powers and functions and, in some cases, perform the same functions as a court would in the court's absence. This power is not judicial in a sense that constitutes a violation of the principle of separation of powers, but is administrative and therefore described as 'quasi-judicial.' " (2 Cal.Jur.3d, *supra,* Administrative Law, § 359, pp. 429-430, fns. omitted.)

Generally, a court's determination of whether an agency's hearing procedures are in compliance with relevant statutes and regulations, and with an agency's own policies, requires application of the rules of statutory interpretation and construction. (*Yamaha*

_____

5    "While the right to practice a profession is a property right which should not be denied without clear proof of violation of the law, employment as a public officer or employee is not such a property right and no hearing is required unless mandated by statute or agency rules or public policy." (2 Cal.Jur.3d (2007) Administrative Law, § 434, pp. 499-500, fns. omitted.) There is no claim that Do was not afforded his administrative remedies.

18

*Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 12.) In such cases,

" 'The appropriate mode of review . . . is one in which the judiciary, although taking

ultimate responsibility for the construction of the statute, accords great weight and

respect to the administrative construction. [Citation.]' " (*Ibid*.; see also *Aguilar v.*

*Association for Retarded Citizens* (1991) 234 Cal.App.3d 21, 28 [general rule of judicial

deference to agency's interpretation of its own regulations, unless interpretation is clearly

erroneous or unreasonable].)

      B.  Independent Judgment Standard for Trial Court Does Not Apply Here

Despite the above generally accepted case law approach that allows the University

a broad scope of quasi-judicial administrative authority for resolving job-related disputes,

Do continues to argue that the trial court was required or authorized to apply the

independent judgment standard of review in light of *Sarka, supra,* 146 Cal.App.4th 261,

271.  In that case, the appellate court did not disagree with the trial court's utilization of

the independent judgment standard for evaluation of the facts and law underlying a

University employment decision.  Plaintiff Dr. Sarka, a medical doctor, had been

discharged from University employment "for repeatedly refusing to follow the directions

of his superior to modify his approach to patient care." (*Id*. at p. 263.)  The University

administrative hearing officer upheld the termination, as did the trial court.

In Dr. Sarka's appeal, the court determined as a matter of law that the hearing

officer and the trial court had each appropriately considered and properly applied a

statute that declares a public policy that employers may not penalize physicians

"principally for advocating for medically appropriate health care." (Bus. and Prof. Code,

19

§ 2056, subd. (c); *Sarka, supra,* 146 Cal.App.4th 261, 271.)  Further, the appellate court ruled that substantial evidence supported the trial court's conclusion that Dr. Sarka was discharged for insubordination, not for any improper reason, and judgment for the University was affirmed.  (*Ibid.*)

Since the principal issue in *Sarka, supra*, 146 Cal.App.4th at pages 263 and 271 through 272, was "whether the hearing officer and the trial court committed legal error by failing to apply Business and Professions Code section 2056," the appellate court appropriately decided that issue on a de novo basis, "[t]o the extent the trial court [had] decided pure questions of law on undisputed facts," and determined that the trial court did not err in that respect.  Next, the appellate court stated it had reviewed the "trial court's exercise of independent review of an agency determination for substantial evidence."  (*Id.* at p. 271, citing *Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 824.)  However, in neither aspect of its review did the appellate court in *Sarka, supra,* 146 Cal.App.4th 261, 271 expressly or impliedly address the precise issues of law presented in *Ishimatsu, supra,* 266 Cal.App.2d 854, concerning the nature of the University under the California Constitution, article IX, section 9, as a constitutionally created statewide agency that has been delegated "quasi-judicial power by the Constitution."  (*Ishimatsu, supra,* at p. 862.)  Rather, the principal challenge in *Sarka* presented pure statutory interpretation questions, which could properly be treated as questions of law, before any substantial evidence review of the record was conducted by the appeals court.

Do's case is not so narrowly focused on a purely legal issue.  He was not discharged in violation of any public policy, statutory or contractual right.  (See

20

*Ishimatsu, supra*, 266 Cal.App.2d at p. 861.) Rather, he was dismissed because he failed to comply with University policy and core values. He has not been deprived of the right to work elsewhere, only at the University. (*Ibid.*; see *Arroyo v. Regents of University of California, supra*, 48 Cal.App.3d 793, 798.) Accordingly, the standard set forth in *Ishimatsu, supra,* 266 Cal.App.2d 854, 862, for an employee's challenge of the administrative decisions of a constitutional agency that were rendered in a quasi-judicial forum, applies here: "[T]he reviewing court is limited to determining whether there was substantial evidence supporting the agency's decision." (*Ibid.*) *Sarka, supra,* 146 Cal.App.4th at page 270, is not to the contrary, because of the nature of the legal issues actually decided in it. In ruling on Do's case, the trial court correctly distinguished *Sarka* and therefore it properly declined to exercise its independent judgment to determine whether the weight of the evidence supported the findings. (§ 1094.5, subd. (c).)

III

*MERITS OF DO'S ARGUMENTS*

A. Substantial Evidence Review and Standards

As outlined above, the trial court appropriately applied substantial evidence review to examine the entire administrative record, to determine whether the agency's findings were supported by substantial evidence. (*JKH Enterprises, Inc. v. Department of Industrial Relations* (2006) 142 Cal.App.4th 1046, 1058; *MHC Operating Limited Partnership v. City of San Jose* (2003) 106 Cal.App.4th 204, 217-220.)

On review, our task is similar. Here, as in *Apte, supra*, 198 Cal.App.3d 1084, 1090, "we are not free to indulge in an independent reconstruction of the events: our

21

view of the record must be circumscribed by a limited appellate review of University proceedings." We examine all relevant evidence in the administrative record and view that evidence in the light most favorable to the judgment, resolving all conflicts in the evidence and drawing all inferences in support of the judgment. (*Young v. Gannon* (2002) 97 Cal.App.4th 209, 225; *Taylor Bus Service, Inc. v. San Diego Bd. of Education* (1987) 195 Cal.App.3d 1331, 1340; *Hosford v. State Personnel Bd.* (1977) 74 Cal.App.3d 302, 306-307.)

The burden is on Do, the appellant, to prove there was an abuse of discretion through the issuance of a decision that was unsupported by substantial evidence. (*Young v. Gannon*, *supra*, 97 Cal.App.4th at p. 225.) Only if no reasonable person could reach the conclusion reached by the administrative agency, based on the entire record before it, will a court conclude that the agency's findings are not supported by substantial evidence. (*Torres v. Dept. of Alcoholic Beverage Control* (1961) 192 Cal.App.2d 541, 545; *Oskooi v. Fountain Valley Regional Hospital* (1996) 42 Cal.App.4th 233, 243 [a reviewing court must uphold administrative findings unless they are so lacking in evidentiary support as to render them unreasonable].)

## B. Issues Presented; Analysis

Do attacks the evidentiary support for the dismissal decision in several ways. First, he contends there was no evidence he had any intent to cause Fletcher to fear for his own safety, and no termination decision would be proper unless Do could be proven to have such an intent. He acknowledges that the standards for evaluating threats or intimidation in the workplace are different from those for evaluating criminal threats.

22

(See *People v. Toledo* (2001) 26 Cal.4th 221, 229-233 [discussing Pen. Code, § 422].) He argues that his June 4 statement, "get out of my face" was less than seriously threatening, nor did his explanatory comment on July 8 about not "decking" Fletcher (upon receiving the written warning) amount to a threat at that time. He contends his statements at the July 8 meeting were nothing more than an expression of his internal thoughts or interpretation about what previously happened, and he was not acting aggressively on July 8, but was slumped in his chair, so evidence of intimidation is completely lacking.

Do also argues that the evidence does not support any conclusion that Fletcher could have had any "reasonable" fear of harm on the day of the "get out of my face" incident, or a month later, when Do was confronted and questioned about it. He objects that the hearing officer should not have relied in this matter upon Adams's e-mail, because it was hearsay. He contests the probative value of its statement that she was at the July 8 meeting and she understood Do to explain that he had told Fletcher to get out of his face, because it was "better than getting violent" to tell him so. Adams did not testify at the hearing about those understandings, so she cannot supply the only corroboration of Fletcher's testimony about his beliefs. (Gov. Code, § 11513, subd. (d) [hearsay evidence cannot by itself support an administrative finding].)

The trial court's order analyzes all the evidence presented and acknowledged there was a dispute about the events leading up to the June 4 statement, but in any case, the court found that the statement itself and at least one of the July 8 statements at the meeting (so that Do would not "deck" Fletcher), were undisputed. We agree with Do that

23

the trial court's ruling is mistaken in referring to Adams as "testifying" at the administrative hearing, regarding Do saying, "it's better than getting violent." Her statement to that effect only appears in an e-mail sent to Becker, the labor specialist, to summarize the events of the meeting at which she was present.

Adams's e-mail was not the only evidence presented on the intimidation issue. Do did not deny making the statement, "so that I wouldn't deck him," but testified that he did not remember it or think he would have done so. Fletcher testified he felt threatened after the July 8 meeting, and it seemed like Do was trying to intimidate him then. There was testimony from Pawlicki that after the June 4 statement and up until the time of the July 8 meeting, Fletcher was expressing growing discomfort in managing Do. As the hearing officer noted in his decision, Do may have been overqualified for his job as number two on the team, and he showed frustration in taking supervision. The trial court found there was substantial evidence to support the hearing officer's finding that Do's July 8 statement caused Fletcher to reasonably fear for his safety, in light of the nature of their work as a two-person team who worked closely together. The record supports the court's conclusion that under the evidence presented, "[w]orking in close physical proximity to an individual who has made statements indicating he at least contemplated a physical attack is sufficient to establish a reasonable fear for one's safety."

Do next argues that since he did not intend to create fear, and since Fletcher should not reasonably have felt fear, no more than speculation was brought forward to support the charges of threats or intimidation. Do therefore contends no "serious misconduct" was committed that would have justified the dismissal remedy, so the

24

University should have followed its own procedures for progressive, lesser discipline, and not doing so amounted to violation of his substantive due process rights. (University Personnel Policies 62 (Mar. 1, 2002), 64 (Jan. 1, 2001) [providing for corrective action before discharge].) However, as outlined above, the hearing officer did not rely merely on speculation of future harm, because the evidence demonstrated instances of growing stress and strain in the working relationship, over time, that could have caused Fletcher to have developed a reasonable fear for his safety. This was sufficient to show Do's statement was an intentional act within the meaning of the zero tolerance policy, as the University officials were entitled to interpret the policy. (*Aguilar, supra,* 234 Cal.App.3d 21, 28.)

As acknowledged by the trial court, progressive discipline is not warranted under University policy when acts of insubordination or other "serious misconduct" have been proven. Under all of the circumstances, the hearing officer was justified in finding that Do's intentional statements were acts of intimidation in violation of University policy, so that a lesser remedy was not required. For the same reasons, Do's argument that he is unfairly being punished for his private thoughts is not justified, when his statements are viewed in context of the work circumstances and the delivery of the warning letter.

On substantial evidence review, we do not "weigh the evidence, consider the credibility of witnesses, or resolve conflicts in the evidence or in the reasonable inferences that may be drawn from it." (*Huang v. Board of Directors* (1990) 220 Cal.App.3d 1286, 1293-1294.) Viewing the evidence in the light most favorable to the judgment, resolving conflicts and drawing inferences in support of the judgment, we

25

conclude that although this was a close case, as the trial court frankly acknowledged, the University provided substantial evidence from which the hearing officer could reasonably conclude that the University's personnel policies were violated.  (*Young v. Gannon*, *supra*, 97 Cal.App.4th at p. 225; *JKH Enterprises, Inc. v. Department of Industrial Relations*, *supra*, 142 Cal.App.4th p. 1058.)  The judgment must be affirmed.

### DISPOSITION

The judgment is affirmed.  Each party shall bear its own costs.


HUFFMAN, J.

WE CONCUR:


McCONNELL, P. J.


IRION, J

26

Filed 6/11/13

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


JAMES DO,                                                    D061056

    Plaintiff and Appellant,

    v.                                                    (Super. Ct. No. 37-2011-00083720-
                                                              CU-WM-CTL)
THE REGENTS OF THE UNIVERSITY OF
CALIFORNIA,                                                   ORDER CERTIFYING OPINION
                                                              FOR PUBLICATION
    Defendant and Respondent.


THE COURT:

    The opinion filed May 13, 2013, is ordered certified for publication.



                                         McCONNELL, P. J.

Copies to:  All parties