Filed 9/16/15  Dorfman v. University of California, San Diego CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| JONATHAN DORFMAN, | D065865 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2012-00101760-CU-WM-CTL) |
| UNIVERSITY OF CALIFORNIA, SAN DIEGO et al., | |
| Defendants and Respondents. | |

APPEAL from an order of the Superior Court of San Diego County, Joel M. Pressman, Judge.  Reversed.

Robert P. Ottilie for Plaintiff and Appellant.

Charles F. Robinson, Karen J. Petrulakis, Margaret L. Wu and Michael R. Goldstein for Defendants and Respondents.

Jonathan Dorfman, an undergraduate student at the University of California, San Diego (UCSD), was dismissed from the university after he was found to have violated its

Policy on Integrity of Scholarship[1] for the second time.  Dorfman sought relief in the superior court and appeals that court's order denying Dorfman's petition for writ of administrative mandate to compel UCSD to overturn its dismissal.  We conclude UCSD did not provide Dorfman with a fair proceeding and, accordingly, reverse.

FACTUAL AND PROCEDURAL BACKGROUND

A

*Alleged Violation of UCSD's Policy on Integrity of Scholarship*

On July 1, 2011, Dorfman was notified by the dean of his college that his CHEM 6B instructor, John Crowell, alleged Dorfman cheated on a midterm exam during the prior term.  The exam in question was given on May 25, 2011, over a month before Dorfman was notified of Crowell's accusation.  Crowell distributed four versions of the exam, A, B, C, and D.  Each of the 618 students who took the exam received one of the four exam versions and a Scantron test form premarked with the corresponding version letter in pencil on the front and in permanent ink on the back.  Crowell suspected Dorfman of cheating because after the term had ended he discovered the front of the test form Dorfman submitted was altered from version D to version A.

The exam was administered in four different classrooms.  Crowell provided written instructions to the proctors in each classroom that stated the proctors should print "a *condensed version* of the [instructions] on the blackboard."  (Italics added.)  The instructions included a direction to check the exam version against the test form version

_____

[1]     The Policy on Integrity of Scholarship is also referred to in this opinion as the academic integrity policy.

2

and inform a proctor if the version letters did not agree. The instructions also stated in bold capital letters "DO NOT ALTER YOUR SCANTRON." Crowell stated his practice was to visit each exam room at the beginning of the test and personally instruct students to notify someone if there was a discrepancy between the exam booklet and Scantron version letters.

Dorfman admitted that the exam and test form he received were mismatched, that he did not notify anyone of the discrepancy, and that he erased the D marking and marked A. He did not recall being told to notify anyone if the exam and test form versions did not agree. Dorfman claimed that if the instruction was provided orally, he did not hear it because when he arrived at his assigned classroom, the room was full and he was directed to another classroom causing him to arrive late. Dorfman also did not recall seeing instructions on the blackboard. No other student or proctor in the classroom where Dorfman took the test reported observing Dorfman copying from another student during the exam.

After the semester ended, Crowell discovered Dorfman and four other students had altered the version letters on the test form. As a result, on June 29, 2011, Crowell submitted an instructor report form to the university's Academic Integrity Coordinator, Tricia Bertram Gallant, Ph.D., alleging Dorfman violated the university's academic integrity policy by altering the premarked test form. Because Crowell did not collect the exam booklet and permitted students to take them home for study purposes, he did not have direct proof that Dorfman was not given a D exam. Dorfman also did not have the

3

booklet, which he kept to study for the final exam then threw away when he moved out of his apartment after the term ended.

UCSD's "Instructor's Guide for Preventing and Processing Incidents of Academic Dishonesty" outlines responsibilities of instructors and students with respect to the school's academic integrity policy and provides guidance to instructors to prevent academic misconduct. The guide states students are expected to notify instructors or other appropriate administrative officers "about any incident of dishonesty they observe." Instructors are told "[t]he responsibility for enforcing academic honesty rests with" them and that they should take "every precaution to minimize opportunities for academic misconduct." The "Tips for Preventing Incidents of Academic Misconduct" section of the guide suggests precautions that instructors should take to minimize academic dishonesty during examinations. These tips include asking "students to write their names in ink on all pages of the exam," asking students "to write on their exam their row number and the names of students seated to their left and right," and to "[i]mmediately collect *all* exam papers . . . ." (Italics added.)

The guide also tells instructors it is their responsibility to "[p]romptly confront any student(s) suspected of academic dishonesty in a manner that respects the student's privacy and the right to due process" and that this confrontation "will usually involve meeting with the student to discuss the charges, the evidence, and proposed academic consequences." Similarly, the guide suggests that "[i]n cases in which the evidence can be clearly documented, e.g. plagiarism [and] identical answers submitted by two

4

students" the instructor should "[m]eet with the student [who is accused of academic misconduct] to discuss the charges, the evidence, and possible academic consequences."

B

*Initial University Proceeding*

After Dorfman received notice of Crowell's allegation he was informed that, because he was under academic probation for a prior incident of academic misconduct, he faced possible dismissal from UCSD. When he was notified of the allegation Dorfman denied any wrongdoing and submitted a request for all documentation supporting Crowell's allegation. On July 25, 2011, Dorfman requested a hearing before an Academic Integrity Review Board (AIRB) under the academic integrity policy to dispute the charge.

In response to Dorfman's initial request for documentation, UCSD provided him a copy of his altered test form and a statement that Dorfman was "suspected to have changed Exam [two] from D to A. The evidence is that your [S]cantron was altered based on the discrepancy from the front [versus] back of the [S]cantron and the erasure marks." Dorfman asked if any additional evidence existed and was told he had received all of the existing documentation related to the allegation against him. The university also informed Dorfman he would receive a briefing packet at least five days before the hearing and that under the school's policy, new material could be added at the hearing at the discretion of the presiding officer.

Dorfman then retained an attorney, Robert P. Ottilie, to assist with his preparation for the hearing.[2] Ottilie requested additional information about the alleged cheating, including a seating chart and the test forms of students who sat near Dorfman at the exam. After several additional unsuccessful requests for information about the charges, and just five days before the scheduled hearing, Ottilie was provided with Crowell's report for the AIRB hearing. The report indicated for the first time that Dorfman was accused of copying another student's answers. Crowell stated he had compared Dorfman's answers to those of the other students in the class and found that Dorfman's answers on 24 of the 26 exam questions (eight wrong and 16 correct) were the same as those of another student, referred to as Student X. Student X's test form was marked with version A and he or she took the exam in the same room as Dorfman. Crowell's report also asserted that Crowell had consulted with a professor from another university with experience in statistical analysis. That professor concluded that the chances of Dorfman and Student X having eight wrong matching answers by coincidence was a billion to one.

Once Dorfman and Ottilie received Crowell's report, Ottilie immediately and repeatedly asked Gallant to reveal the identity of Student X and to provide the test form data Crowell and the consulting professor used to arrive at their conclusion that Dorfman copied from Student X. Gallant denied Ottilie's requests for the identity of Student X, taking the position that because Student X was not aware of the allegation against

_____

[2]    The university did not permit Ottilie to represent Dorfman at the hearing. Under the academic integrity policy a student accused of academic dishonesty may be represented only by a student advocate.

6

Dorfman he or she was not a relevant party to the proceeding. Dorfman was provided with the test form data used by the consulting professor, but only two days before the hearing. After the hearing, which was conducted in October 2011, the AIRB issued its decision finding Dorfman violated UCSD's Policy on Integrity of Scholarship. Shortly after, Dorfman was notified that the Council of Deans, the body responsible for imposing sanctions under the academic integrity policy, had imposed the sanction of dismissal from UCSD.

Dorfman appealed the AIRB's decision and dismissal to UCSD's Council of Provosts. He contended that altering the version letter on the test form was not a violation of the university's policy and that there was insufficient evidence to support the AIRB's finding he had copied from Student X. Dorfman also argued his due process rights were violated in various ways, including Crowell's failure to raise the cheating allegation before the end of the semester and the university's refusal to identify Student X. Dorfman also asserted that Gallant inappropriately assisted Crowell in obtaining testimony from the consulting professor who had opined on the statistical significance of Dorfman's and Student X's matching answers.

The Council of Provosts concluded Gallant had improperly solicited the opinion of an outside expert and provided him with test form data, in effect assisting Crowell with his case against Dorfman without being authorized to do so by the Policy on Integrity of Scholarship. The Council also disapproved of the university's failure to provide Dorfman with the statistical data used by the expert until just two days before the hearing,

concluding that as a result Dorfman was precluded from retaining his own expert or conducting his own statistical analysis. The Council of Provosts suspended the sanction of dismissal pending the outcome of a new AIRB hearing.

## C

### *Second University Proceeding*

After the Council of Provosts issued its decision, Ottilie sent a letter to UCSD again seeking the identity of Student X. In the alternative, Ottilie sought the exclusion of Student X's test form from the hearing. Ottilie then submitted a letter to UCSD 's Office of Student Conduct seeking rulings on three formal motions: a motion in limine to exclude any reference to Student X or his or her test form; a motion seeking the recusal of the new presiding officer, Dean Patty Mahaffey; and a motion to exclude any reference to other students claimed by Crowell to have cheated by altering the version of the test form they submitted.

Dorfman's motion with respect to Mahaffey asserted that, as part of the Council of Deans responsible for determining sanctions for violations of the academic integrity policy, she had prejudged Dorfman by deciding before the first AIRB hearing that dismissal was an appropriate sanction for Dorfman's alleged misconduct. The Office of Student Conduct denied Dorfman's request that Mahaffey recuse herself. It explained Mahaffey's consultation with the other deans was routine in academic misconduct cases because the university's policy "imposes an affirmative obligation on the Dean of the

8

accused [s]tudent's [c]ollege" to advise the charged student of the sanction he or she faces before an AIRB hearing.

After UCSD denied Dorfman's motion concerning Mahaffey, Mahaffey sent a letter to Dorfman and Ottilie with her rulings on Dorfman's other motions. With respect to Student X, she stated she would obtain the identity of the student from Crowell and contact the student to "judge his/her interest and willingness to either participate in th[e] review or submit a written statement." Mahaffey granted Dorfman's motion with respect to other students Crowell alleged had cheated by changing the exam version on their test forms, agreeing this information was irrelevant and excluding any reference to it from the hearing.

In response to Mahaffey's rulings, Ottilie sent a letter to Mahaffey objecting to her contacting Student X. Ottilie stated the proposal was not authorized by the academic integrity policy and noted the Council of Provosts' reversal of the dismissal after the first hearing was based in part on Gallant improperly contacting a witness on behalf of UCSD. Ottilie stated his concern that Mahaffey's contact would result in the university receiving information that Dorfman would not have access to and that Mahaffey might influence Student X's decision whether to participate in the hearing. Rather than contact Student X, Ottilie requested Mahaffey "make an evidentiary ruling and exclude reference to the Student X [S]cantron evidence . . . ."

In response to Ottilie's objection, Mahaffey stated she would not contact the student, but ruled the test form could still be included in the hearing and Dorfman could

raise the issue again at the hearing. Ottilie sent another letter to Mahaffey clarifying that Dorfman objected to Mahaffey contacting Student X because it was not authorized by UCSD's policies and that he wanted Mahaffey to make a ruling on that objection. Ottilie then stated that if Mahaffey ruled the objection was well taken, Mahaffey should then also rule on the underlying motion to exclude the Scantron test form from the hearing. Mahaffey responded by repeating her earlier decision to allow the test form and, "per [Ottilie's] request," not "attempt to contact [Student X] to gather additional information."

The second review hearing took place on April 27, 2012. Dorfman and Crowell presented their cases to the panel who asked questions throughout. Without relying on the statistical analysis prepared by the other professor, Crowell advanced the same basic case he presented at the first hearing. He argued the chances of Dorfman's answers matching those of Student X were extraordinarily small and could not have been by coincidence. He offered no evidence concerning where Dorfman was seated in relationship to Student X. In his presentation Dorfman refuted the charge that he copied from another student. In response to Crowell's assertion that the two exams could not have matched by coincidence, Dorfman said that he found over 40 other instances of pairs of Scantrons with 23, 24 or 25 matching answers and that half of these pairs involved students who were sitting in different classrooms.

On May 2, 2012, the AIRB issued its decision finding Dorfman had changed his test form from version D to version A, that 24 of 26 answers on Dorfman's test form matched only one other exam, and that the matching exam was version A and was taken

10

by a student in the same exam room as Dorfman. The panel also found Dorfman had failed to adequately explain the identical sequences of answers. The panel concluded it was more likely than not that Dorfman violated the academic integrity policy and found him responsible for exam misconduct. The following day Dorfman was notified that the Council of Deans had again imposed dismissal from UCSD as the sanction for the misconduct.

Dorfman appealed to the Council of Provosts, asserting his due process rights were violated by the university's refusal to identify Student X, Crowell's delay in asserting an allegation against Dorfman, and Mahaffey's role as the hearing officer. Dorfman also asserted insufficient evidence supported the panel's findings. The appeal was rejected on June 6, 2012.

D

*Superior Court Proceedings*

On August 12, 2012, Dorfman filed a petition for writ of mandate in the superior court against UCSD and the Regents of the University of California. Dorfman again asserted his procedural due process rights had been violated and insufficient evidence supported the AIRB's findings. The Regents answered, denying each claim. After full briefing and a hearing, on February 10, 2014, the court issued a writ of mandate concluding the AIRB's evidentiary findings did not support the ultimate finding that Dorfman had cheated on the exam. The court found the university had failed to provide any evidence to show the matching exams were more than a statistical anomaly. The

court rejected Dorfman's contention that he had not been afforded a fair process. The trial court's order set aside the AIRB's decision and ordered a rehearing at the option of the Regents.

Thereafter, the Regents moved for reconsideration or, in the alternative, a new trial under Code of Civil Procedure, section 657.[3] Dorfman also sought reconsideration and modification of the order to preclude a rehearing by UCSD. After further briefing and another hearing, the trial court granted the Regent's motion for reconsideration and reversed its prior ruling setting aside the AIRB's decision. The trial court's new order concluded sufficient evidence supported the AIRB's finding and again rejected Dorfman's claims of procedural unfairness.

DISCUSSION

In this appeal, Dorfman again asserts the university violated his right to a fair disciplinary proceeding by excluding Student X as a witness and by allowing Mahaffey to serve as the presiding officer. He also argues Crowell's evidence was insufficient to support the AIRB's findings. Additionally, Dorfman contends the trial court erred by considering documentation that was not part of the administrative record and by granting the Regent's motion for reconsideration. We agree with Dorfman that the university's refusal to provide him with the identity of Student X violated the Regents' and UCSD's own policies mandating certain minimum procedural protections in disciplinary

---

[3]     All further statutory references are to the Code of Civil Procedure.

proceedings.  Without this information, Dorfman could not adequately defend himself against the charge of copying.  Because we conclude reversal of the AIRB's decision and the university's dismissal is warranted on this basis alone, we do not reach Dorfman's other contentions on appeal.  (See *In re Marriage of Carlsson (*2008) 163 Cal.App.4th 281, 291 [" 'Denying a party the right to testify or to offer evidence is reversible per se.' "].)

I

Section 1094.5, subdivision (b) governs our review of an administrative proceeding.  Under this statute, mandamus is required where a party is deprived of a fair trial or the proceedings are not conducted "in the manner required by law."  (§ 1094.5, subd. (b).)  "The ultimate determination whether an administrative proceeding was fundamentally fair is a question of law to be decided on appeal." (*Southern Cal. Underground Contractors, Inc. v. City of San Diego* (2003) 108 Cal.App.4th 533, 542 (*Southern Cal. Underground Contractors*).)  "Thus, we independently evaluate [Dorfman's] claims that [he] was denied a fair hearing."  (*Ibid.*)

The university is bound by its own policies and procedures.  (*Berman v. Regents of University of California,* (2014) 229 Cal.App.4th 1265, 1271-1272 (*Berman*).)  Additionally, UCSD's "rule-making powers and its relationship with its students are subject to constitutional guarantees."  (*Goldberg v. Regents of University of Cal.* (1967) 248 Cal. App. 2d 867, 875.)  A disciplinary proceeding at a university does not provide the same due process protections afforded to a defendant in a criminal trial.  (*Id*. at

13

p. 881.) However, "to comport with due process," the university's procedures must " ' be tailored, in light of the decision to be made, to "the capacities and circumstances of those who are to be heard," [citation] . . . to insure that they are given a meaningful opportunity to present their case.' " (*Southern Cal. Underground Contractors*, *supra*, 108 Cal.App.4th at p. 545.)

"[A] court's determination of whether an agency's hearing procedures are in compliance with relevant statutes and regulations, and with an agency's own policies, requires application of the rules of statutory interpretation and construction." (*Do v. Regents of University of California* (2013) 216 Cal.App.4th 1474, 1488.) Deference is accorded to the university's interpretation of its own policies and procedures because of its expertise in the subject. (*Berman, supra*, 229 Cal.App.4th at p. 1272.)

II

The Regents' "Policy on Student Conduct and Discipline" requires its universities to implement certain minimum procedural standards to assure fair hearings in situations where a formal hearing is deemed appropriate to resolve alleged misconduct. These minimum requirements specifically include "[t]he opportunity for a prompt and fair hearing where the University shall bear the burden of proof, and at which the student shall have the opportunity to present documents and witnesses and to confront and cross-examine witnesses presented by the University . . . ." UCSD's academic integrity policy, in turn, provides "the general rules and procedures associated with student integrity of

14

scholarship" and implements the Regents' policy mandating minimum procedural safeguards in disciplinary proceedings.

Under UCSD's policy, a student may contest an alleged violation of the academic integrity policy by submitting "a written request for an Academic Integrity Review to the appropriate" dean within 12 days of receiving notification of the allegation. An academic integrity coordinator (AIC) then schedules the review "to explore and investigate the incident giving rise to the charge and to reach an informed, *evidence-based conclusion* as to whether the [academic integrity p]olicy was violated." (Emphasis added.) Once the student has requested a hearing, section seven of the policy states that "the relevant documents will be collected, including the facts of the charge by the Instructor and the Student's dispute of the facts of the charge." Section seven also permits the student and instructor to submit "additional documents relevant to the charge, or the names and contact information of any additional people (e.g., classmates, teaching assistants) who have knowledge relevant to the charge (Relevant Parties)." Section eight of UCSD's policy gives the instructor and student "the right to present [r]elevant [p]arties and question all [r]elevant [p]arties present" at the hearing. The provision defines a "[r]elevant [p]arty" as "one with direct and material understanding of the allegation."

III

Crowell's allegation was based solely on (1) Dorfman's alteration of the version letter on his Scantron, which UCSD concedes was insufficient to support the charge, and (2) Dorfman's answers matching those of Student X. No eye witness evidence showed

15

Dorfman copied from another student. Dorfman may have been able to exonerate himself completely by showing Student X was not seated near him. Where Student X sat during the exam was, therefore, "knowledge relevant to the charge" under section seven of UCSD's academic integrity policy.

Further, because Crowell did not create a seating chart for the exam or institute any of the other safeguards specifically suggested by UCSD to prevent this type of cheating—for example collecting the exam booklets from the students after the exam or asking students to write their row numbers and names of neighboring students on their exams—the only avenue available to Dorfman to obtain this information was through Student X. Crowell's unexplained delay in reviewing the exam materials until after the term was over and Dorfman had discarded the exam booklet, also contrary to UCSD's suggested practices, further contributed to Dorfman's inability to defend against the allegation without Student X's identity. In these circumstances, UCSD's refusal to provide Student X's identity violated the minimum procedural requirements afforded by the Regents and UCSD set forth above. Without this information, Dorfman was deprived of a meaningful "opportunity to present documents and witnesses and to confront and cross-examine witnesses presented by the University" as required by UCSD's own policy.

UCSD's assertion that Student X's identity was not relevant because it could prove its case based on the low probability that Dorfman and Student X had 24 of 26 matched answers by chance is not well taken. Regardless of how high the odds of the answers

16

matching by coincidence were, the chance existed.[4] Since there was no allegation or showing by UCSD that Dorfman and Student X were cooperating, evidence that Student X was not seated where Dorfman could see his or her exam could establish the matching answers were that rare coincidence. Without any ability to determine where Student X sat, Dorfman's defense was unfairly crippled. (See *Andersen v. Regents of University of California* (1972) 22 Cal.App.3d 763, 771 [student facing expulsion from college is " 'entitled to a "fair hearing," ' " which includes an "opportunity to present his defenses."] and *Fremont Indemnity Co. v. Workers' Comp. Appeals Bd.* (1984) 153 Cal.App.3d 965, 971 [" 'All parties must be fully apprised of the evidence submitted or to be considered, and must be given opportunity to cross-examine witnesses, to inspect documents and to offer evidence in explanation or rebuttal. In no other way can a party maintain its rights or make its defense.' "].)

UCSD argues that the definition of relevant parties ("one with direct and material understanding of the allegation") contained in section eight of its Policy on Integrity of Scholarship supports its decision to keep Student X's identity secret. Although deference is afforded to the university's interpretation of its own policies, we do not agree with UCSD's narrow reading of this provision. As an initial matter, the definition does not purport to limit the student's ability to investigate the allegations against him. The provision, titled "Parties Attending the A[cademic] I[ntegrity] R[eview]," on its face

---

4       At oral argument, Ottilie suggested there was also no reason for Crowell to have assumed that Dorfman, and not Student X, was the cheater. Dorfman's admitted modification of the Scantron version letter, however, was a reasonable basis for Crowell's conclusion that Dorfman and not Student X was the culprit.

addresses who may attend the hearing and not what information the university or accusing instructor must provide to the student.

Further, section seven (titled "The Review Packet") explains the process of preparing the compilation of documentation about the charges to be used at a hearing. This provision suggests a broader scope of relevant evidence. Section seven states that in addition to the documentation used by the instructor to initiate the charges, the student or instructor may submit "additional documents relevant to the charge, or the names and contact information of any additional people (e.g., classmates, teaching assistants) who have knowledge relevant to the charge (Relevant Parties)." The discovery of the location of where Student X sat during the exam, or in this case the identity of Student X to seek that information, falls within the evidence contemplated by this provision. This information was highly relevant to the allegation against Dorfman regardless of whether Student X could be excluded from attending the hearing under section eight.[5] Indeed, at oral argument UCSD's counsel conceded that where Student X sat during the exam was potentially "dispositive."

---

[5]     UCSD also argues "there were sound reasons for leaving X out of this, given the strength of the incriminating evidence" against Dorfman. It quotes *Jaska v. Regents of University of Michigan* (E.D.Mich. 1984) 597 F. Supp. 1245 to state that " 'the need for anonymity of student accusers, who might otherwise be the victim of reprisals from fellow students, could prevail over the right to confrontation.' " (*Id*. at p. 1253.) Student X did not accuse Dorfman of cheating. The accusation stemmed solely from Crowell's review of the Scantrons after the semester ended. While there may be sound reasons to protect the identity of students in various circumstances, there was no reason in this case to believe Dorfman or anyone else would threaten Student X. (See *John A. v. San Bernardino City Unified School District* (1982) 33 Cal.3d 301, 308 [school board could not rely on written statements of witnesses where "there is no showing or finding of a significant and specific risk of harm."].)

Finally, UCSD contends that even if Dorfman had the right to learn Student X's identity, he waived that right by objecting to Mahaffey's offer to contact the student to gauge his or her willingness to participate. As stated, Crowell's case against Dorfman was based solely on the facts that (1) Dorfman altered the exam version letter on the Scantron and (2) his answers matched Student X's answers. Where Student X sat was vital to Dorfman's ability to defend himself against the charges. Ottilie did object to Mahaffey contacting Student X, but his concern over Mahaffey influencing the student (consciously or otherwise) was reasonable after the prior Academic Integrity Coordinator was found to have improperly solicited testimony and evidence on behalf of Crowell for the first hearing.

Further, Ottilie clarified the basis for his objection was that it was an ex parte communication that was not authorized, but that if the Scantron was admitted and Mahaffey ruled her contact was proper under the academic integrity policy, she should make contact. There was nothing improper in Ottilie's attempts to preserve Dorfman's objection to the ex parte communication with Student X. Those attempts did not result in a waiver of Dorfman's right to assert that UCSD's repeated refusal to provide him with Student X's identity violated his right to a fair process. (*See Rinaker v. Superior Court* (1998) 62 Cal.App.4th 155, 168 ["Waiver is ' " 'the intentional relinquishment of a known right after knowledge of the facts.' " ' [Citations.] Courts will not presume acquiescence in the loss of a fundamental constitutional right . . . ; rather, we must indulge in every reasonable presumption *against* the waiver of such a right."].)

DISPOSITION

The order denying Dorfman's petition for a writ of mandate is reversed. The trial court is directed to issue a writ of mandate requiring UCSD to set aside its dismissal and remanding the matter to UCSD for further proceedings consistent with this opinion.

O'ROURKE, Acting P. J.

WE CONCUR:

AARON, J.

IRION, J.