Filed 3/26/21 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT


| | |
|---|---|
| RAMAKRISHNA AKELLA, | H045886 |
| | (Santa Cruz County |
| Petitioner and Respondent, | Super. Ct. No. 17CV03234) |
| | |
| v. | |
| | ORDER MODIFYING OPINION |
| | AND DENYING REHEARING |
| THE REGENTS OF THE UNIVERSITY | [NO CHANGE IN JUDGMENT] |
| OF CALIFORNIA, | |
| | |
| Respondent and Appellant. | |


THE COURT:

It is ordered that the opinion filed herein on February 16, 2021, and certified for publication on March 11, 2021, be modified as follows:

On page 13, after the last sentence of the first full paragraph which ends with the words "review the factual basis behind the agency's order or decision for 'substantial evidence in . . . light of the whole record.' (*Id*., subd. (c).)," insert the following footnote:

**6** Akella asserts, for the first time in a petition for rehearing, that the university's disciplinary decision implicates a fundamental right concerning employment and, as such, requires independent review of the factual basis for the agency's decision under section 1094.5, subdivision (c). Akella is correct that the standard of review in the superior court and on appeal "depends on the nature of the right affected by the administrative decision." (*MHC Operating Limited Partnership v. City of San Jose* (2003) 106 Cal.App.4th 204, 217, citing § 1094.5, subd. (c).) Indeed, " '[i]f the decision

of an administrative agency will substantially affect a "fundamental vested right," then the trial court must not only examine the administrative record for errors of law, but must also exercise its independent judgment upon the evidence. [Citation.]' " (*Ibid.*) But this case was never litigated as implicating a fundamental right. To the contrary, Akella's briefing—both as petitioner in the superior court and as respondent on appeal—expressly declined to make that assertion, stating instead that the case does *not* involve a fundamental vested right. In his respondent's brief on appeal, for example, Akella quoted *Schafer v. City of Los Angeles* (2015) 237 Cal.App.4th 1250, for the relevant standard of review " 'in a case not involving a fundamental vested right . . . .' " (*Id.* at p. 1261 [noting that in an administrative mandamus proceeding not involving a fundamental vested right, the reviewing court "reviews the administrative record to determine whether substantial evidence in the record supports the agency's factual findings"].) Akella also repeated his acknowledgment in his briefing to the superior court that there was "no 'fundamental vested right' " at issue.

Having failed to assert at the outset that the university's disciplinary proceedings involved a "fundamental vested right in his employment" (*Wences v. City of Los Angeles* (2009) 177 Cal.App.4th 305, 318), Akella has forfeited the argument on petition for rehearing. (See, e.g., *Alameda County Management Employees Assn. v. Superior Court* (2011) 195 Cal.App.4th 325, 338, fn. 10; accord *Curtis Engineering Corp. v. Superior Court* (2017) 16 Cal.App.5th 542, 551 ["Generally, a party may not assert new arguments and authorities for the first time in a petition for rehearing"].)

All footnotes commencing with footnote 6 shall be renumbered accordingly.

The petition for rehearing filed on behalf of respondent Ramakrishna Akella is denied.

There is no change in the judgment.

BAMATTRE-MANOUKIAN, J.

GREENWOOD, P.J.

GROVER, J.

Filed 2/16/21; Certified for Publication 3/11/21 (unmodified version)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| RAMAKRISHNA AKELLA, <br><br> Petitioner and Respondent, <br><br> v. <br><br> THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, <br><br> Respondent and Appellant. | H045886 <br> (Santa Cruz County <br> Super. Ct. No. 17CV03234) |

In this appeal we address whether the instructional workload policy of a department at the University of California, Santa Cruz, authorized the department chair to assign an additional course to a professor to compensate for deficiencies in the professor's fulfillment of his standard teaching workload. Professor Ramakrishna Akella refused to teach the additional course, which he believed department chair Brent Haddad had no authority to assign. Haddad, together with Joseph Konopelski, then dean of the school of engineering, filed a disciplinary complaint against Akella. A hearing committee of the Academic Senate Committee on Privilege and Tenure found that Akella had violated the Faculty Code of Conduct. The chancellor adopted the committee's recommendations and imposed disciplinary sanctions. Akella sought review by writ of administrative mandate. The superior court ruled in Akella's favor and ordered respondent, the Regents of the University of California (Regents), to set aside the disciplinary order. The Regents appeal from the judgment of the superior court. We find

that substantial evidence in the record supported the university's decision and reverse the judgment of the superior court.

## I.    FACTUAL AND PROCEDURAL BACKGROUND[1]

### A.  Department Workload Policies and Course Load Dispute

The Department of Technology Management (department) is part of the University of California at Santa Cruz (university) Baskin School of Engineering.  The department houses the technology and information management degree programs.  Haddad became the department chair shortly after the department was formed in 2013.

The department adopted an instructional workload policy.  The document, effective spring 2013 and titled "The Technology Management Department Instructional Workload Policy" (workload policy), described in pertinent part the teaching mission of the department and instructional workload for faculty members.  Paragraph (a) of the workload policy addressed the "annual departmental course load."  It stated, "The standard annual course load for a faculty member in the . . . program is five course equivalencies.  Of these, three are formal 5 unit courses at the undergraduate or graduate level and two are for the advising, mentoring, research supervision, and training activities associated with our graduate and undergraduate programs."  The workload policy stated that each course counted "as a single course equivalency," except for research group seminars which were not "formal courses" but counted "toward the fourth and fifth equivalencies."

Paragraph (b) of the workload policy described "[a]dditional teaching responsibilities" to include activities like supervision and support of research projects, grant applications that support student research, conducting research group seminars, academic mentoring and advising of graduate and undergraduate students, teaching

[1] Our summary of the factual and procedural background is drawn from the administrative record, including testimony and exhibits presented at the June 2, 2017 disciplinary hearing before a committee of the university's academic senate, discussed in detail *post*.

2

assistant training and mentoring, curriculum maintenance and revision, and advertising and outreach for the department. The workload policy specified exceptions to the standard course loads based on teaching or other leadership responsibilities outside of the department, sabbaticals, and course buyouts.

In a separate paragraph titled "Course Scheduling," the workload policy stated that the department chair is "responsible for assigning courses to meet the needs of the undergraduates and graduates" in the program. It described procedures for scheduling course assignments among faculty members and stated that the chair "resolves any differences and has final authority for the teaching schedule."

Professor Akella joined the department as a faculty member in 2014. Haddad provided Akella with a copy of the workload policy in an e-mail from March 2014 and asked him to review it, "since it frames our expectations of year-to-year teaching." In a curriculum planning e-mail to department faculty in January 2015, including Akella, Haddad reminded the faculty that under the workload policy, "5 courses per year are expected, one can be reduced for equivalent graduate advising, and one can be reduced for equivalent undergraduate advising. The balance of one's schedule depends on other things, such as one's service or research demands. Of course the prime commitment is providing our curriculum."

The dispute in this case arose when Haddad informed Akella that he would be assigned four "podium courses" to teach in the 2015-2016 academic year. The term "podium course" refers to a regularly scheduled course.

Haddad explained in an e-mail from January 2015 why he assigned Akella four podium courses, rather than three. Haddad wrote to Akella, "I put you down for four classes in [academic year] 15-16 because you are not participating in any undergraduate advising or undergraduate curricular leadership roles. Also there are no offsetting service or research activities that justify reducing your teaching load below 4 courses." Haddad testified at the disciplinary hearing that Akella had no undergraduate

3

advising or curricular leadership roles at the time and a "catastrophic" record on graduate advising and graduate curricular leadership. Haddad believed that he would have been justified in assigning Akella five podium courses based on that record, but he limited it to four courses to leave room for Akella to "turn around" his graduate advising.

Akella refused to accept the assignment of four podium courses. He expressed in meetings with Haddad that his contributions to the department were underappreciated. He rejected one of the course assignments based on his areas of expertise and also disputed that Haddad could assign a fourth podium course under the workload policy. Haddad responded to Akella's concerns about the teaching assignments in an e-mail exchange from July 2015. Haddad wrote, "The assignment of 4 classes is not a penalty. It is a fair sharing of the curriculum based on your overall performance and contribution in research, teaching, and service. In the coming years, . . . if you improve in these areas, it will certainly be reflected in your teaching load."

In e-mail correspondence from January 2015 with Kathy Beattie, academic personnel manager for the school of engineering, Haddad responded to Beattie's request for "clear metrics for measuring all of the faculty's course equivalencies." He compared his assignment of four podium courses to Akella against Akella's teaching and advising record and that of other department faculty members and their course assignments. Beattie told Haddad that the explanation he gave was clear and the assignments were reasonable.

Akella continued to dispute Haddad's authority to assign him the fourth podium course. In September 2015, Akella wrote to Haddad, "Departmental policy is three 5-unit courses per year. There is no policy permitting you to assign me 4 5-unit courses per year as you did . . . . [¶] I will accept an assignment of three courses. I will not accept an assignment of four courses." Haddad responded by reiterating that department policy allowed the chair to assign "up to 5 courses," and that while the standard course load was three courses, he had assigned four because "you did not meet the performance level in

4

2014-2015 for a standard 3 course load in 2015-6." Haddad tried to accommodate other concerns that Akella raised by allowing him to "buyout" one course assignment and by substituting the course that Akella claimed he was unqualified to teach with a different assignment. Akella responded by confirming the two courses that he would teach and his buyout of the third course, and repeated that he would "not be teaching" the fourth course "or any other course assignments beyond the two" that he had agreed upon.

Discussions about the dispute continued between Haddad, Beattie, and dean of the Baskin School of Engineering, Joseph Konopelski. In e-mail correspondence from September 2015, Konopelski told Haddad that he and Beattie had been discussing the matter. Konopelski confirmed that Haddad's assignment of four courses to Akella seemed reasonable based on the available data.

In November 2015, Akella filed a grievance about his teaching load and other issues with the "Academic Senate Committee on Privilege and Tenure" (Privilege & Tenure). In January 2016, Akella's attorney also wrote to the provost and executive vice chancellor, as the chancellor's designee under the Academic Senate bylaws, requesting that the chancellor ask Privilege & Tenure to appoint a committee to hear a preemptive disciplinary case against Akella for his refusal to teach the upcoming spring quarter course. He proposed that an advance ruling on the course load issue would enable the parties to avoid likely harm to the students who had enrolled in the course that Akella "will not teach." The provost responded that she did not support Akella's request.

Privilege & Tenure denied Akella's grievance in a letter from February 2016. The letter stated that as to teaching load, "it is the prerogative of a chair to assign teaching duties, and the chair's action in this case does not seem unreasonable. The chair is in the best position to balance the demands of advising and supervision of individual students against time devoted to formal courses. The 'standard' courseload is only a guideline, and not a limitation on the chair's assignment of courses."

5

Haddad was not aware of Akella's efforts to obtain a preemptive ruling on the teaching load grievance and expected him to appear for the start of term. Akella did not appear to teach the scheduled course in March 2016, leaving about 80 enrolled students in a lurch. The department "ran a fire drill to install" the teaching assistant as a student instructor, while another faculty member stepped forward to be the teaching advisor to the graduate students.

## B. Disciplinary Complaint and Administrative Hearing

The department took disciplinary action against Akella for his refusal to teach the assigned course. Konopelski and Haddad filed a formal complaint before the campus provost/executive vice chancellor in April 2016.[2] The complaint alleged violations of the Faculty Code of Conduct (Code of Conduct, Academic Personnel Manual (APM-015))[3] for failure to meet the responsibilities of instruction, including "significant failure to adhere, without legitimate reason, to the rules of the faculty in the conduct of courses, to meet class, . . . or to hold examinations as scheduled" (Code of Conduct, Part II, Section A.1.c) and for intentional disruption of functions or activities sponsored by the university (Code of Conduct, Part II, Section C.1).

Akella filed a written response to the complaint in which he acknowledged his refusal to teach the course. He contended, however, that Haddad as department chair had no authority to assign him four podium courses. Akella framed the "sole issue" as whether Haddad had the authority to assign classes to department faculty "at his discretion under APM-245,"[4] or whether Haddad's discretion under the Faculty Code of

---

[2] The Academic Senate Bylaws in effect at the time provided that disciplinary action commenced by the administration against an employee member of the Academic Senate, like Akella, is considered by the Senate's Committee on Privilege and Tenure. (Former Academic Senate Bylaw 336, subd. (A), *available at*: **https://perma.cc/G69V-4ZQ2** [as of Feb. 11, 2021].)

[3] The policies and procedures issued by the provost and executive vice president of academic affairs, including the Faculty Code of Conduct, are published in the Academic Personnel Manual, commonly called the "APM."

[4] APM-245 states in part, "The chair's administrative duties include the following: 1. To make teaching assignments in accordance with the policy described in Academic Senate Regulation 750 and to assign other duties to members of the department staff."

6

Conduct "is limited by the [workload policy], which states the 'standard annual course load' is three formal 5 unit courses at the undergraduate or graduate level."

Akella argued that while APM-245 grants department chairs the discretion to assign classes to department faculty, the university "has chosen to limit that discretion by requiring every department to have an Instructional Workload Policy." In support, Akella relied on a university-level guidance document titled "UCSC Department Instructional Workload Policy Guidelines, February 2008" (Guidelines). The Guidelines instructed that "department policies are expected to address at least each element described" therein. Among these, element (h) titled "Research/Creative/Scholarly inactivity" directed department policies to "[s]tate if the department modifies teaching loads for faculty members who are less active in their research/creative/scholarly activities, and if so how."

Akella pointed out that the department's workload policy did not address the required element (h) on research/creative/scholarly inactivity. He argued that because the department faculty approved a workload policy *without* the required element, faculty effectively voted *not* to give the department chair the authority to add to the three formal 5-unit courses that the chair could assign a department faculty member to teach during an academic year.

A committee tasked with reviewing the complaint and Akella's response to the allegations "unanimously and unreservedly" rejected the argument that the workload policy limited the chair's authority to assign more than three 5-unit courses. The committee explained that "[a]s Senate faculty, we understand that the campus's established workload is a five course equivalency, which applies to all ladder-rank faculty across the campus, and that department chairs have plenary authority to determine the appropriate teaching assignments for individual faculty in their department based on this established standard." The committee found probable cause of a violation of the Code of Conduct and recommended disciplinary action.

7

The campus provost and executive vice chancellor agreed with the conclusions of the committee and proposed disciplinary action, which gave Akella the right under Academic Senate Bylaw 336 to a formal hearing.

A Privilege & Tenure hearing committee held an evidentiary hearing on the disciplinary complaint on June 2, 2017 (administrative hearing). The question presented was whether the administration had proven, by clear and convincing evidence, the violations set forth in the proposed disciplinary action. The administration presented several witnesses, including Haddad and Konopelski. Akella, represented by counsel, elected not to testify or present witnesses but argued that the administration failed to meet the burden of proof to demonstrate a violation of the Code of Conduct.

Haddad testified about the department's workload policy, his reasons for assigning Akella to teach four podium courses in the 2015-2016 academic year, and his attempts to negotiate an acceptable resolution with Akella, as summarized above. Haddad acknowledged on cross-examination that at the time the department's workload policy was drafted, he was not aware of the Guidelines for department instructional workload policies. He agreed that element (h) of the Guidelines was intended to address research/creative/scholarly inactivity and to inform faculty that extra teaching or service could be assigned to them. But he believed that even without such a provision, paragraph (a) of the workload policy authorized him to assign four or even five courses if a faculty member's equivalency of advising and other activities was deficient. Haddad acknowledged that the department later adopted a revised workload policy, effective March 2017, to include a provision on "research/creative/scholarly inactivity."

John Musacchio is a professor in the department. Musacchio drafted the original workload policy based on templates provided by other departments in the school of engineering. He was not aware of the campus-wide Guidelines. The omission of a provision to address research/creative/scholarly inactivity was not intentional or the result of any considered discussion in the department. Musacchio simply noticed that the

8

computer science department's policy, which he relied on, had "no formal policy" for paragraph (h), so Musacchio simply omitted it from his draft.

Kathy Beattie, director of academic affairs for the school of engineering, testified that at the time of Akella's course load dispute she was the academic personnel manager for the engineering school. One of her roles was to oversee the consistency of the departments' curriculum and leave plans with their workload policies. Beattie stated it was "not [her] understanding" that a research/creative/scholarly inactivity provision in the department's workload policy would have addressed whether a faculty member's curriculum and leave plan included three, four or five podium courses. She understood that provision "could increase" the course assignment above five, not decrease course assignments to fewer than five. Beattie believed that paragraph (a) of the workload policy informed the faculty that "instead of three five-unit courses, which would be the normal [teaching assignment], assuming, adequate four and five equivalency instructional activities, that fourth and fifth equivalency could turn into a formal course." She testified that she found Haddad's course assignment to Akella appropriate and consistent with the workload policy. She had discussed Akella's concerns with him at the time but believed that his complaints about the fourth course assignment was better put before Privilege & Tenure.

Konopelski was the interim dean during the relevant time period, having previously served as the chair of the chemistry department, the associate dean in the division of physical and biological sciences, and the chair of the Santa Cruz division of the Academic Senate. Konopelski viewed the workload policy as "a guideline for assigning teaching podium time, if you will, based on a collection of teaching, research, and service, that are expected of a tenure track faculty member." He agreed on cross-examination that the department's workload policy did not directly inform faculty members that a teaching load could be increased above three podium courses at the discretion of the chair but added that neither did the policy indicate it could not be done.

9

Konopelski believed that the chair had the authority to assign courses under the APM, and that a reasonable faculty member would understand the workload policy meant that deficient undergraduate or graduate advising could result in the standard three podium courses going up to four or five.

Richard Hughey is a professor of computer and biomolecular engineering. He is also a vice provost and dean of undergraduate education. Hughey developed the instructional workload policy for the computer science department. He testified that his department's provision on research inactivity was effectively addressed in the paragraph (a) provision on course load, in that "a research-inactive person would not be supervising graduate independent studies, and so those would not be subtracted out [of the five-course equivalency]. And in practice, we had some faculty who indeed those would subtract out and were getting higher teaching loads as a result." Hughey stated that as chair of his department, he had discretion to vary assignments to make sure the curriculum was covered.

In a report dated October 31, 2017, Privilege & Tenure informed the chancellor of its decision rejecting Akella's argument that Haddad did not have the authority to assign a fourth podium class. Privilege & Tenure reasoned that while the department's workload policy did not expressly grant the chair that authority, the "clear intention" of the policy was for a faculty member to provide "the *equivalent* of five 'podium' courses." Privilege & Tenure found that if a faculty member's service in mentoring and advising did not amount to the equivalent of two courses, the "standard annual course load" described in the workload policy could "only be met by the faculty member's teaching more than three podium courses." Privilege & Tenure concluded that Akella's failure to appear to teach the assigned course violated the Code of Conduct as alleged in the administration's complaint. It recommended disciplinary action in the form of a 15 percent annual salary reduction for one year and the placement of a letter of censure

10

in Akella's personnel file. The chancellor adopted Privilege & Tenure's findings and recommendation for the imposition of disciplinary sanctions.

## C. Petition for Writ of Administrative Mandate

Akella filed a verified petition for writ of administrative mandate in Santa Cruz County Superior Court on December 18, 2017 and moved for issuance of a peremptory writ of mandate (petition). The petition challenged the administrative decision on the ground that Privilege & Tenure's finding that Akella violated provisions A.1.c and C.1 of the Faculty Code of Conduct was not supported by the evidence and constituted a prejudicial abuse of discretion. Akella sought issuance of a writ of mandate pursuant to Code of Civil Procedure section 1094.5, directing the Regents to set aside the disciplinary order and sanctions.

Akella's central contention was that the authority of a department chair at the University of California comes from the Academic Personnel Manual, specifically APM-245, but that the workload policy approved by the department had limited the number of five-unit courses the chair could assign. Akella interpreted paragraph (a) of the workload policy as an expression of that limit, since it stated that the "standard annual course load for a faculty member in the . . . program is five course equivalencies," and "[o]f these, *three are formal 5 unit courses* . . . and two are for the advising, mentoring, research supervision, and training activities . . . ." (Italics added.) Akella contrasted the workload policy against those of other departments that expressly authorized their chair to increase a faculty member's annual teaching load for an identified reason. Akella further interpreted the paragraph in the workload policy titled "Course Scheduling" as granting the chair "final authority" over only the teaching *schedule* as it related to the timetable and location of courses and not as it related to the teaching load.

The Regents denied the pertinent allegations of the complaint and sought judgment in favor of the administration. In opposing the petition, the Regents pointed to the plain language of the workload policy and its consistent interpretation by the

11

administration's witnesses as substantial evidence to support Privilege & Tenure's determination that the department chair had the authority under the workload policy to assign a fourth podium course to Akella. The Regents also questioned how departmental policies—which serve only as guidelines—could limit the chair's authority as set forth in the Academic Personnel Manual, which according to case authority has " 'the force and effect of statute.' " (*Lachtman v. Regents of University of California* (2007) 158 Cal.App.4th 187, 198.)

The superior court entered a tentative ruling in Akella's favor, finding there was no substantial evidence to support Privilege & Tenure's decision. The court adopted its tentative ruling at a hearing on the petition and granted Akella's motion for peremptory writ of administrative mandate. The superior court explained its reasoning on the record, stating that "[e]ven at the highest levels of university thinking, 3 plus 2 is not equal to 4. . . . University, if it wants to apply different rules, needs to adopt different rules so that its professors know what their conduct has to be. [¶] . . . [T]his professor was told five classes, three at the podium, two in less strenuous activities, and then he was ordered to do four."

On May 11, 2018, the superior court entered judgment ordering the Regents to set aside the decision of the Privilege & Tenure committee, disciplinary order and sanctions. The Regents filed a timely appeal from the judgment.

## II. DISCUSSION

The Regents challenge the superior court's order granting a peremptory writ of mandate to set aside the disciplinary decision and sanctions. The Regents contend that in granting the writ petition, the court misapplied the standard of review and ignored substantial evidence in the administrative record that supported Privilege & Tenure's decision. Akella responds that the superior court was correct in granting him relief, because regardless of the university witnesses' personal interpretations of the workload policy, its plain language did not, in fact, authorize the assignment of a fourth podium

12

course.  We find Akella's construction incompatible with the plain language of the workload policy and reasonable inferences drawn therefrom, and contrary to substantial evidence in the record which supported Privilege & Tenure's policy interpretation.

## A. Administrative Mandate and Standard of Review

Code of Civil Procedure section 1094.5,[5] the state's administrative mandate statute, governs judicial review of adjudicatory decisions by administrative agencies. (*Young v. City of Coronado* (2017) 10 Cal.App.5th 408, 418; § 1094.5, subd. (a).)  The inquiry of the reviewing court extends to questions about the agency's jurisdiction to proceed, whether there was a fair trial, and "whether there was any prejudicial abuse of discretion." (§ 1094.5, subd. (b).)  An abuse of discretion is established if the administrative agency has failed to proceed "in the manner required by law, [or] the [agency's] order or decision is not supported by the findings, or the findings are not supported by the evidence." (*Ibid.*)  We review the factual basis behind the agency's order or decision for "substantial evidence in . . . light of the whole record." (*Id.*, subd. (c).)

"In applying the standard, we focus on the decision of the agency rather than that of the trial court and ' "answer the same key question as the trial court . . . whether the agency's findings were based on substantial evidence." ' " (*Colony Cove Properties*, *LLC v. City of Carson* (2013) 220 Cal.App.4th 840, 866.)  This requires the reviewing court to consider all relevant evidence in the administrative record and view that evidence in the light most favorable to the agency's findings, drawing all inferences in support of those findings. (*Do v. Regents of University of California* (2013) 216 Cal.App.4th 1474, 1490 (*Do*).)  The reviewing court does not substitute its own findings and inferences for that of the agency. (*McAllister v. California Coastal Com.* (2008) 169 Cal.App.4th 912, 921 (*McAllister*).)  "Only if no reasonable person could reach the conclusion reached by

---

[5] Unspecified references are to the Code of Civil Procedure.

13

the administrative agency, based on the entire record before it, will a court conclude that the agency's findings are not supported by substantial evidence." (*Do*, *supra*, at p. 1490; accord *McAllister*, *supra*, at p. 921.)

On the other hand, the reviewing court "exercises independent judgment on pure questions of law, including the interpretation of statutes . . . ." (*McAllister*, *supra*, 169 Cal.App.4th at p. 921; see *MHC Operating Limited Partnership v. City of San Jose* (2003) 106 Cal.App.4th 204, 219 [applying independent review "[t]o the extent that the administrative decision rests on" the agency's interpretation or application of statute].) While the parties in this case appear to agree that the court's interpretation of university policy calls for independent review, they disagree as to whether this court assigns any deference to the university's interpretation of its own policies. We discuss the issue of deference in the next part, *post*.

## B. Validity of the Regents' Interpretation of the Workload Policy

We begin with the workload policy's description of the "standard annual course load for a faculty member" in the department as "five course equivalencies. Of these, three are formal 5 unit courses at the undergraduate or graduate level and two are for the advising, mentoring, research supervision, and training activities associated with our graduate and undergraduate programs."

In ruling on the disciplinary complaint, Privilege & Tenure rejected Akella's claim that paragraph (a) of the workload policy did not authorize the chair to assign four podium courses. It reasoned that "section (a) of the [workload policy] *should* be interpreted as granting the Chair that authority. Otherwise it would make no sense for the policy to say that 'the *standard* annual course load for a faculty member in the [technology management] department is five course equivalencies.' . . . The clear intention of the policy is that a faculty member is expected to provide the *equivalent* of five 'podium' courses. If the faculty member's service in the areas of mentoring and

14

advising does not amount to the equivalent of two courses, this expectation can only be met by the faculty member's teaching more than three podium courses."

The Regents argue that this interpretation is supported by the plain language of the policy and merits judicial deference. The Regents cite cases espousing deference to an agency's interpretation of its own regulations, rules or policies, as well as deference to judgments made by educational institutions about their academic affairs. (See, e.g., *Berman v. Regents of University of California* (2014) 229 Cal.App.4th 1265, 1272 (*Berman*) [explaining that it independently reviews and interprets the university's student conduct code at issue in the case, and in doing affords the Regents' interpretation of the code "great weight"]; *Doe v. University of Southern California* (2018) 28 Cal.App.5th 26, 43 [noting general judicial stance of nonintervention in the academic affairs of schools]; see also Cal. Const. art. IX, § 9 [granting broad powers of self-governance to the Regents of the University of California].)

Akella rejoins that independent review in which the court shows some deference to an agency's interpretation is circumscribed and applies only when the language being interpreted is ambiguous. (See, e.g., *Bonnell v. Medical Board* (2003) 31 Cal.4th 1255, 1265 (*Bonnell*) [concluding that deference to agency's interpretation of statute was "unwarranted" because that interpretation was "incorrect in light of the unambiguous language of the statute"].) He contends that the workload policy unambiguously allows the department chair to assign only three podium courses.

The parties' competing positions on deference cite selectively from what is actually a range of guidance on the subject. The degree of deference to an agency's interpretation of a statute or regulation is contextual: as much as courts "independently judge the text of the statute [or rule or regulation], taking into account and respecting the agency's interpretation of its meaning" (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7 (*Yamaha*)), the " 'weight' " of any such deference is "fundamentally situational" (*id*. at p. 12, italics omitted). The high court reaffirmed

15

*Yamaha*'s framework in *Bonnell*, explaining that the deference accorded to an agency's interpretation "should be dependent in large part upon whether the agency has a ' "comparative interpretative advantage over the courts" ' and on whether it has arrived at the correct interpretation." (*Bonnell*, *supra*, 31 Cal.4th at p. 1265.)

In asserting that judicial deference to an agency's opinion comes into play *only* if the language at issue is ambiguous, Akella misses the broader framework articulated in *Yamaha*. That framework requires us to consider that although the interpretation of university policy at issue here does not depend on special " 'expertise and technical knowledge' " (*Yamaha*, *supra*, 19 Cal.4th at p. 12), the members of the hearing committee are " 'likely to be intimately familiar with [department-authored policy] and sensitive to the practical implications of one interpretation over another.' " (*Ibid.*) We believe that contextual familiarity matters. The disputed policy language, while not complex or technical, should be interpreted in a manner that is both knowledgeable of and sensitive to the needs of department and university population to which it applies. (See *Simi Corp. v. Garamendi* (2003) 109 Cal.App.4th 1496, 1505 [noting the "particular expertise" of the agency's commissioner in that case was a "deep understanding of the *context* in which the regulation exists"]; *Berman*, *supra*, 229 Cal.App.4th at pp. 1271-1272 [explaining that the court accords great weight and respect to the administration's construction of the university's student conduct code based on its expertise and familiarity with the legal and regulatory issues].)

Also relevant are factors suggesting the agency's interpretation is likely to be correct (*Yamaha*, *supra*, 19 Cal.4th at p. 12), including "whether the agency has adhered consistently to the interpretation at issue and whether there was an opportunity for comment to be made on that interpretation" (*Simi Corp.*, *supra*, 109 Cal.App.4th at pp. 1504-1505). Here, the workload policy was developed somewhat informally, unlike an administrative rule whose adoption is subject to formal review and comment. Even so, Akella's dispute with his course load assignment led to several requests for review

16

by senior officials in the university administration, each time resulting in a consistent interpretation of the workload policy as a valid basis for the chair's workload assignment.

The consistency of these findings, through and including the disciplinary determination that is the subject of this appeal, is not dispositive. But considering it is well within the Regents' constitutionally-delegated authority (Cal. Const. art. IX, § 9) to hear and resolve disputes related to the administration of the university's academic affairs "by applying University policies to particular cases" (*Do*, *supra*, 216 Cal.App.4th at p. 1487), we conclude that Privilege & Tenure's interpretation is entitled to a reasonable degree of judicial deference. The policy language remains, however, subject to our independent review, with any deference commensurate with the thoroughness of Privilege & Tenure's consideration and the validity of its reasoning. (*Yamaha*, *supra*, 19 Cal.4th at pp. 14-15; cf. *Do*, *supra*, at p. 1488 [citing general rule of deference to agency's construal of its own policies, "unless interpretation is clearly erroneous or unreasonable"]; *Berman*, *supra*, 229 Cal.App.4th at p. 1272.)

### *The Workload Policy Did Not Limit the Department Chair's Ability to Assign Four Podium Courses in Fulfillment of the Requirement for Each Faculty Member to Teach Five Course "Equivalencies"*

"Generally, the rules that govern interpretation of statutes also govern interpretation of administrative regulations." (*Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086, 1097.) Courts apply these same rules of interpretation to policies promulgated by administrative bodies, like the workload policy in this case. (See, e.g., *Berman*, *supra*, 229 Cal.App.4th at p. 1271 [interpreting university procedural policy according to rules of statutory interpretation].) Further, policies established by the Regents according to their constitutionally derived rulemaking and policymaking power, like the Academic Personnel Manual, have the force and effect of statute. (*Kim v. Regents of University of California* (2000) 80 Cal.App.4th 160, 165 (*Kim*).)

17

Applying the general rules of statutory interpretation and construction, we find Privilege & Tenure's conclusion is consistent with the plain language of the workload policy, reasonable inferences drawn therefrom, and the intent conveyed by the authorizing Academic Personnel Manual.  In interpreting the workload policy, we " 'give the regulatory language its plain, commonsense meaning.' " (*Hoitt v. Department of Rehabilitation* (2012) 207 Cal.App.4th 513, 523 (*Hoitt*).)  " 'If possible, we must accord meaning to every word and phrase in a regulation, and we must read regulations as a whole so that all of the parts are given effect.  [Citation.]' . . . Our primary aim is to ascertain the intent of the administrative agency that issued the regulation."  (*Ibid*.)

There is no question that the plain language of paragraph (a) of the workload policy allowed the chair to assign three podium courses.  But the phrase "three are formal 5 unit courses" did not stand alone.  It followed the definition of a faculty member's standard annual course load as "five course equivalencies" in which three "course equivalencies" consisted of five-unit teaching assignments and two "course equivalencies" consisted of corollary activities in student advising and supervision.  Akella's focus on the phrase "three are formal 5 unit courses" all but ignores the requirement that we read the policy as a whole, giving effect to all of its parts, and with the primary aim to ascertain the intent of the agency that issued the policy.  (*Hoitt*, *supra*, 207 Cal.App.4th at p. 523.)

The intended meaning here is not ambiguous:  the department expected each faculty member to carry a workload *equivalent to* five courses.  The term "equivalency" and identification of a total amount of equivalencies leads naturally to an inference that substitutions may be made—otherwise it would be superfluous to include an overall framework of "five course equivalencies."  Like the hearing committee, we therefore reject the interpretation of "three are formal 5 unit courses" as imposing a rigid cap on podium teaching assignments.  To infer such a cap would be incongruous with the intent

18

of the policy and the prefatory language providing that "[t]he standard annual course load for a faculty member . . . is five course equivalencies."

We find Privilege & Tenure's interpretation is furthermore consistent with a certain measure of flexibility inherent in the workload policy, allowing for its functionality. For example, paragraph (a) acknowledges that "large enrollments" in some undergraduate classes still count only as a "single course equivalency," while on the other hand research group seminars count only toward the "fourth and fifth course equivalencies." As provided by paragraph (c), "[s]ignificant campus service or other administrative roles may . . . provide course relief" while teaching an interdisciplinary course can count toward the formal teaching load. And approval for a non-teaching term pursuant to paragraph (f) may relieve a faculty member from teaching courses for that term but not from advising and supervisory duties. These provisions show that the policy anticipated and intended to support some reconfiguring of duties without diminishing the expectation that faculty members fulfill their standard annual workload.

The separate sections titled "Overview" and "Course Scheduling" reinforce this understanding of the workload policy by framing the faculty teaching load in terms of curriculum needs. The "Overview" states at the outset that the "teaching mission" of the department involves "formal instruction of scheduled classes, laboratory sections, seminars" and "includes advising and mentoring undergraduates, undergraduate research experiences," and supervision and training of graduate students and Ph.D. candidates. "Course Scheduling" makes the department chair responsible for "assigning courses to meet the needs of the undergraduates and graduates . . . ." The section places the chair in charge of the process for soliciting "faculty preferences for course assignments and teaching schedule[s]" and gives the chair "final authority for the teaching schedule." Contrary to Akella's reading, the "Course Scheduling" section is not entirely distinct from the section titled "Instructional Workload Policy" in that it refers both to course

19

assignments and teaching schedule, and more to the point, designates the chair as the overseer of both processes.

Akella's formalistic construction restricting the chair's "final authority" to the timing aspect of course scheduling would make the workload policy unworkable. "Literal construction of language should not prevail if it is contrary to the plain intent of the regulation. [Citation.] . . . We interpret a regulation to make it reasonable and workable." (*Hoitt*, *supra*, 207 Cal.App.4th at p. 523.) As stated, the intent of the workload policy is to establish a framework for the department's faculty to serve the curricular needs of the department. The assigning and scheduling of courses necessarily requires holding the faculty accountable to their standard annual work load. Given the provisions in the policy that enable some accommodation for alternate arrangements within that structure, and the practical necessity that the department chair serve as the final authority in matters of course assignment as well as scheduling, we do not believe that the absence of an express provision for the eventuality that occurred here is controlling. It would be unreasonable to interpret the workload policy in a way that obstructs the department chair from ensuring the faculty members fulfill their standard annual work load of five course equivalencies despite failing to meet the other equivalencies in student advising and research supervision.

What is more, we do not construe the workload policy as limiting the chair's authority set forth in the Academic Personnel Manual. Appendix A (APM-245) specifies the duties of department chairs, starting with "planning the programs of the department in teaching, research, and other functions." First and second among the list of "administrative duties" are: "1. To make teaching assignments . . . and to assign other duties to members of the department staff"; and "2. To prepare the schedule of courses and of times and places for class meetings." As noted, policies established by the University of California Regents have the force and effect of statute. (*Kim*, *supra*, 80 Cal.App.4th at p. 165.) The language of the workload policy in no way curtails the grant

20

of authority to the chair under APM-245. Instead, it establishes the expected workload equivalencies for faculty members in accordance with the university's Guidelines, which state that "[d]epartment workload policies describe teaching expectations presented in the context of the department's overall mission." The workload policy does just that, describing the teaching expectations for the academic year, specifying how the equivalencies are to be met, and leaving the chair to oversee that process consistent with the Academic Personnel Manual and the provisions of the workload policy itself.

We conclude that based on the plain language of the workload policy and the reasonable inferences drawn therefrom, Privilege & Tenure's interpretation of the policy was valid and warrants due deference. (See *Berman*, *supra*, 229 Cal.App.4th at p. 1272.) It was neither unreasonable nor clearly erroneous (*Do*, *supra*, 216 Cal.App.4th at p. 1488) for the committee to conclude that Haddad had the authority to assign a fourth podium course to Akella as a substitute for unfulfilled equivalencies. Neither an explicit grant of such authority nor a "catchall provision" to address a faculty member's nonperformance of expected duties was required.

### Substantial Evidence in the Record Supported the Hearing Committee's Finding That the Department Chair Had the Authority to Assign Four Podium Courses

Akella relied entirely for his defense at the administrative hearing on Haddad's purported lack of authority to assign a fourth podium course. Having concluded that the workload policy allowed Haddad to assign the fourth course to Akella in fulfillment of his otherwise-unfulfilled annual workload (in Haddad's estimation), we briefly address the additional evidence in the record.

Konopelski and Beattie, both of whom had extensive experience in administrative roles with the university, confirmed their understanding that Haddad's workload assignment to Akella was appropriate and authorized under the workload policy. Konopelski viewed the workload policy as "a guideline for assigning teaching podium time" based on the combination of teaching, research, and service expected of tenure

21

track faculty. He believed that a reasonable faculty member would understand from the policy that a deficit in student advising could increase the standard three podium courses to four or even five. Beattie testified that the "normal" teaching load of three 5-unit courses as stated in paragraph (a) of the workload policy was "assuming[] adequate four and five equivalency instructional activities."

This testimony presented a consistent understanding among those university administrators that the chair had authority to assign more than three podium courses based on his determination that the fourth and fifth equivalencies were not being met. Haddad's communications to department faculty and Akella at the start of the curriculum planning process for the 2015 to 2016 academic year were also consistent with this perspective on the workload policy. Haddad's curriculum planning e-mail in January 2015 told department faculty that "5 courses per year are expected" under the workload policy, "one can be reduced for equivalent graduate advising, and one can be reduced for equivalent undergraduate advising. The balance of one's schedule depends on other things, such as one's service or research demands. Of course the prime commitment is providing our curriculum." Haddad repeated these points in subsequent communications with Akella about why he had assigned him to teach four podium courses. Haddad also demonstrated his effort to implement the policy consistently in his January 2015 e-mail to Beattie, who had requested "clear metrics for measuring all of the faculty's course equivalencies." Beattie found Haddad's assignments were reasonable based on his explanation of each department faculty member's comparative teaching load and other curricular and advisory duties.

Professor Hughey, whose faculty roles included chair of the computer engineering department for eight years and vice provost and dean of undergraduate education for more than five years, expressed a similar understanding of the chair's role and authority. Hughey disagreed with the suggestion on cross-examination that as chair of his department he relied solely on an algorithm to "plug in the data for each person and come

22

up with the number of courses" to assign. Hughey explained that "being a department chair is really always looking at a complete picture, it's . . . looking at a balance both for the department as a whole, making sure the curriculum is filled for an individual faculty, making sure the contributions are high. And there are some things . . . , like . . . how do you measure service . . . there has to be judgment in there." He clarified that the workload policy was a guideline, and that variations in faculty workloads in advising and other areas required the chair to use judgment in making final decisions, with a focus on ensuring that the curriculum was covered.

There is no evidence in the record contradicting this understanding of the workload policy. Most notably, as previously discussed, Akella's efforts to confirm the validity of his refusal to accept the fourth course assignment were unsuccessful. Privilege & Tenure rejected Akella's November 2015 grievance on the matter of his teaching load in blunt terms: "[I]t is the prerogative of a chair to assign teaching duties, and the chair's action in this case does not seem unreasonable. The chair is in the best position to balance the demands of advising and supervision of individual students against time devoted to formal courses. The 'standard' courseload is only a guideline, and not a limitation on the chair's assignment of courses."

Akella contends that even if Haddad's interpretation of the workload policy was reasonable, the reasons he gave for assigning a fourth podium course to Akella were inconsistent and fail to serve as substantial evidence that he applied the policy correctly. We find the argument unconvincing. In Haddad's first e-mail explanation, he told Akella that he put him "down for four classes in [academic year] 15-16 because [he was] not participating in any undergraduate advising or undergraduate curricular leadership roles" and because "there are no offsetting service or research activities that justify reducing your teaching load below 4 courses." In the second e-mail, Haddad clarified that the course load assignment was "not a penalty" but "a fair sharing of the curriculum based on your overall performance and contribution in research, teaching, and service." Far from

displaying an inconsistent or unreasonable interpretation of the workload policy, these statements about the workload assignment reflected a sensible understanding of faculty members' duties for the fourth and fifth equivalencies, as outlined in the workload policy, and touched on aspects of "additional teaching responsibilities" outlined in the policy that otherwise might have "offset" the lack of advising and curricular leadership.

Akella also contends that there was no evidence of an intent for the workload policy to allow the chair, at his discretion, to increase a faculty member's teaching load up to five podium courses. He points to Musacchio's testimony that when he prepared the workload policy for the department, he never looked at the campus-wide Guidelines, which modeled language in element (h) about increased teaching load due to research/creative/scholarly inactivity. However, we find as discussed above that the plain language of the policy supported the interpretation that Haddad and the university administration applied to it. Musacchio's unintentional omission of a provision on research or scholarly inactivity did not preclude the chair from modifying the teaching assignments consistent with the total expected course equivalences under the workload policy. Simply put, element (h) in the Guidelines would not have controlled Haddad's decision to assign Akella to teach four podium courses. As stated in Haddad's e-mails at the time and in his administrative hearing testimony, the primary driver of his decision was Akella's reduced or nonexistent undergraduate advising and curricular leadership, which were responsibilities that fell squarely within the instructional responsibilities discussed in the workload policy as written.

The testimony of Hughey provided additional context for the viewpoint that the omission of element (h) on research/creative/scholarly inactivity from the workload policy did not prevent the chair from assigning up to four or five podium courses. Hughey explained that while the workload policy he created for the computer engineering department (which Musacchio copied for the workload policy at issue) included a paragraph (h) as required by the Guidelines, he added no content to it because he believed

24

that research/creative/scholarly inactivity was effectively addressed by paragraph (a) on course load. According to Hughey, "a research-inactive person would not be supervising graduate independent studies, and so those would not be subtracted out [of the five-course equivalency]."

Akella advances several additional arguments, none of which demonstrates a failure of substantial evidence to support Privilege & Tenure's findings.

First, Akella points out that if there was a deficiency in his *non*-podium teaching responsibilities, Haddad could have required him to increase his commitment to undergraduate advising and related activities. He also contends that the department could have established a provision to allow for the assignment of additional podium courses, as it did in its subsequent addition of a research/creative/scholarly inactivity provision to its revised workload policy, effective March 2017.[6] Both points are true, but neither negates the fact that the policy *as written at the time* authorized Haddad to assign Akella another podium course as a way to meet his overall, five-course equivalency.

Next, Akella argues that the Regents confuse the analysis by relying on witness testimony at the administrative hearing to define the workload policy's meaning instead of focusing on the applicable policy language. We agree that witness testimony would not constitute substantial evidence to support Privilege & Tenure's decision if the testimony sought to "establish an unwritten policy that trumped the written one," as Akella claims. But as set forth above, Privilege & Tenure's interpretation was properly based upon the written policy and further informed by substantial evidence in the record demonstrating the administration's common understanding and interpretation of that policy. The testimony of those faculty members whose actions gave rise to the filing of the disciplinary complaint is a proper consideration, among others, of whether Privilege

---

[6] The provision in the later-revised workload policy states: "*Research/creative/scholarly inactivity*: Faculty who are less active in research or graduate student supervision can be assigned extra teaching or service to make up for this workload deficit. Faculty who are not engaged in any research/creative activity should have additional time for teaching, resulting in a workload of six course equivalencies."

& Tenure's findings were supported by the evidence "in the light of the whole record." (§ 1094.5, subd. (c).) Put differently, if we agreed with Akella that the workload policy imposed a three-podium-course cap on teaching assignments for the academic year, then Privilege & Tenure's assessment of the policy language would be clearly erroneous, and witness testimony contradicting the plain language of the policy would not serve as substantial evidence that it was properly applied. (See *Do*, *supra*, 216 Cal.App.4th at p. 1488 [citing general rule of deference to agency's construal of its own policies, "unless interpretation is clearly erroneous or unreasonable"]; accord *Berman*, *supra*, 229 Cal.App.4th at p. 1272.) Because we do not find that to be the case, the Regents' references to witness testimony about the meaning and application of the workload policy is neither misleading nor improper.

Akella lastly disputes any notion that this is a case which implicates the need to guard academic independence from "meddling courts." He argues that the deferential norm cited by the Regents applies in cases that "go to the substance of academic integrity and rigor," in contrast with what he calls the "very pedestrian employment matter" at issue here.

We disagree with Akella's characterization of the university's decision. A department chair's authority to assign work to meet curricular needs affects the "academic affairs" of the school no less than matters affecting student discipline. (See, e.g., *Doe v. University of Southern California*, *supra*, 28 Cal.App.5th at p. 27 [concerning student discipline for alleged cheating]; *Lachtman v. Regents of University of California*, *supra*, 158 Cal.App.4th at pp. 191-192 [concerning faculty assessment of student academic performance meeting criteria for advancement to doctorate program]; *Paulsen v. Golden Gate University* (1979) 25 Cal.3d 803, 806 [concerning a private university's refusal to award a law degree to a student for repeated, academic failure]; cf. *Kashmiri v. Regents of University of California* (2007) 156 Cal.App.4th 809, 826 [rejecting deferential approach to university decision that did not involve academic or "disciplinary

26

discretion"].)  It is appropriate, for the reasons discussed *ante* (part II.B.), to accord reasonable deference to Privilege & Tenure's interpretation of the workload policy, which guides the faculty in fulfilling the teaching mission of the department.  According deference to the university's interpretation and administration of its internal academic policies in no way precludes judicial review of the administrative decision in accordance with section 1094.5.

We conclude, based on our independent review of the policy language and on substantial evidence in the record to support the university's application of the workload policy, that there is no basis for the court to set aside the university's decision.  The findings of the Academic Senate Committee on Privilege and Tenure were supported by the evidence.  (§ 1094.5, subds. (b), (c).)  We find no prejudicial abuse of discretion (*id*., subd. (b)) in the resulting recommendation and the university's disciplinary order and imposition of sanctions.

## III.    DISPOSITION

The judgment is reversed and the matter remanded to the superior court.  The superior court is directed to deny Akella's verified petition for writ of administrative mandate.  The parties shall bear their own costs on appeal.

27

_____
BAMATTRE-MANOUKIAN, J.

WE CONCUR:

_____
GREENWOOD, P.J.

_____
GROVER, J.

*Akella v. The Regents of the University of California*
**H045886**

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| RAMAKRISHNA AKELLA,<br><br>    Petitioner and Respondent,<br><br>    v.<br><br>THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,<br><br>    Respondent and Appellant. | H045886<br>(Santa Cruz County<br>Super. Ct. No. 17CV03234)<br><br>ORDER CERTIFYING OPINION FOR PUBLICATION |

THE COURT:

The opinion in the above-entitled matter filed on February 16, 2021, was not certified for publication in the Official Reports. Appellant The Regents of the University of California has requested the opinion be certified for publication. Under California Rules of Court, rule 8.1105(c), the opinion is ordered published.

_____
BAMATTRE-MANOUKIAN, J.

_____
GREENWOOD, P.J.

_____
GROVER, J.

| Trial Court: | Santa Cruz County Superior Court |
| | Superior Court No.: 17CV03234 |

Trial Court:                    Santa Cruz County Superior Court
                                Superior Court No.:  17CV03234


Trial Judge:                    Hon. John M. Gallagher


Attorneys for Appellant:        Charles F. Robinson
The Regents of the University of Margaret L. Wu
California                      Michael R. Goldstein


Attorney for Respondent:        John Gregory Derrick
Ramakrishna Akella              Michael Joseph DeNiro


*Akella v. The Regents of the University of California*
**H045886**